72 F.3d 130
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Juan Balderas GARCIA, Jr., Defendant-Appellant.
 No. 95-1224.
 United States Court of Appeals, Sixth Circuit.
 Dec. 4, 1995.
 
 Before: ENGEL, MILBURN, and NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant Juan Balderas Garcia, Jr. appeals his jury convictions, and the sentences imposed thereon, of one count of possession of marijuana with intent to distribute in violation of 21 U.S.C. Sec. 841(a)(1), and one count of conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. Secs. 846 and 841(a)(1). On appeal, the issues are (1) whether the district court abused its discretion in permitting an investigating police officer to testify, over defendant's objection, as to the street meaning of the Spanish term "jale"; and (2) whether the district court erred when it enhanced defendant's offense level by two levels for obstruction of justice under United States Sentencing Guideline ("U.S.S.G.") Sec. 3C1.1, based upon a finding that defendant committed perjury when he testified at trial. For the reasons that follow, we affirm in part and reverse in part.
 
 I.
 A.
 
 2
 On July 21, 1994, a federal grand jury issued a two count indictment charging defendant Garcia with possession of marijuana with intent to distribute in violation of 21 U.S.C. Sec. 841(a)(1) and conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. Secs. 846 and 841(a)(1). Subsequently, defendant Garcia was arraigned on August 29, 1994, and entered pleas of not guilty.
 
 
 3
 A three-day jury trial commenced on October 17, 1994. On October 19, 1994, the jury found defendant Garcia guilty of the charges in both counts of the indictment.
 
 
 4
 On February 15, 1995, defendant Garcia was sentenced to 110 months imprisonment as to both count one and count two, to run concurrently with any sentence he was presently serving, and four years of supervised release as to each count to be served concurrently. This timely appeal followed.
 
 B.
 
 5
 Zeke Anguiano, a cooperating witness, who resided in Brownsville, Texas, testified that in March 1994, pursuant to an agreement between himself and defendant Garcia, who resided in Lansing, Michigan, he transported approximately 100 pounds of marijuana from Texas to Michigan for redistribution and sale. Anguiano stated that he and defendant Garcia "had agreed that if I could get [to Michigan] with the marijuana, he would take care of the rest." J.A. 61.
 
 
 6
 The marijuana was obtained in Brownsville, Texas and transported in the trunk of a Chevrolet Lumina. Anguiano, Roberto Alviar, and Elizabeth Anguiano, Zeke Anguiano's sister-in-law, followed the Lumina from Texas to Michigan in a Chevrolet Blazer. The marijuana was delivered to defendant Garcia's home at 1176 Davis Avenue, Lansing, Michigan.
 
 
 7
 In May 1994, a second load of marijuana, weighing approximately 170 pounds, left Texas for Michigan. The marijuana, which was in two black canvas American Tourister suitcases, was again transported in the trunk of a Chevrolet Lumina driven by Maria Hernandez. The Lumina was again followed by a Chevrolet Blazer occupied by Anguiano, his wife and son, and Elizabeth Anguiano. On May 12, 1994, as the two vehicles approached Rolla, Missouri, they were stopped at a drug checkpoint manned by the Phelps County (Missouri) Sheriffs Department. An exterior search of the Lumina by a drug sniffing dog alerted the police to the presence of drugs.
 
 
 8
 Maria Hernandez was arrested. Subsequently, the police determined that the persons in the Chevrolet Blazer, who had been permitted to leave the drug checkpoint, were travelling with Hernandez. The police caught up with the Blazer and arrested all of its occupants except for Zeke Anguiano's son. In exchange for a promise that the females who were travelling with him, particularly his wife, would not be prosecuted, Anguiano agreed to cooperate with the authorities.[1] Specifically, Anguiano told the authorities that the marijuana was "going to Juan Garcia" in Lansing, Michigan, J.A. 73, and he agreed to cooperate with agents of the United States Customs Service in making a controlled delivery of the marijuana to defendant Garcia's home.
 
 
 9
 On May 15, 1994, Anguiano made a controlled delivery of the two black canvas American Tourister suitcases containing approximately 170 pounds of marijuana to defendant Garcia's home. Anguiano drove to defendant Garcia's home in a car that had been provided to him. The two suitcases, which were in the trunk of the car, were carried into the basement of Garcia's home. As this was being done, the conversation between Anguiano and defendant Garcia was tape recorded because Anguiano was wearing a "wire," a tape recorder, as part of the controlled delivery.
 
 
 10
 After the two suitcases had been carried into the basement of defendant Garcia's home, Anguiano left in the vehicle that had been provided to him. Moments later, law enforcement officers from the Lansing police department executed a search warrant at defendant Garcia's home. In addition to the two black canvas American Tourister suitcases containing the marijuana, which were seized in the basement of defendant Garcia's home, other items of evidence, including a box of .25 caliber ammunition and several scales were seized by the police.
 
 
 11
 At trial, a tape recording of the conversation between Anguiano and defendant Garcia was played for the jury. Because the conversation was in Spanish, a transcription and an English language translation prepared by Max Romero, an interpreter, was also admitted into evidence. Romero testified about his translation.
 
 
 12
 In addition, Detective Sergeant John Jose Gutierrez of the Michigan State Police testified at trial. Gutierrez, who is fluent in Spanish and has 22 years of law enforcement experience, including five years of experience in narcotics investigations, was permitted to testify, over defendant's objection, as an expert as to the meaning of a particular term, namely, "jale," used by Spanish speaking drug traffickers.
 
 
 13
 Defendant Garcia testified at trial in his own behalf. He stated that in March 1994, he did not order marijuana from Zeke Anguiano. He also stated that he had no contact with Zeke Anguiano between March 1994 and May 1994. He stated that Anguiano's arrival at his home on May 15, 1994 was a surprise. Further, he stated that Anguiano brought the first suitcase into his home, and he denied that Anguiano ever told him that the suitcase contained marijuana.
 
 
 14
 Defendant Garcia stated that at Anguiano's request, he went outside and helped him carry in the second suitcase. However, he stated that he did not look inside the suitcase and was not curious as to what it contained. Defendant Garcia stated that after the suitcases were brought inside his home, he told Anguiano to put them in the basement. Defendant Garcia stated that after the suitcases had been taken into his basement, Anguiano, who was complaining that he was hungry, left the house.
 
 
 15
 Defendant Garcia testified that immediately thereafter the police entered his home. He stated that after handcuffing him, they started asking him where the suitcases were that had been brought into his home. He stated that he told the police that the suitcases were in the basement; however, he denied any knowledge that there was marijuana in the suitcases, and denied ever telling the police that there was marijuana in the suitcases. J.A. 127. He also stated that he disagreed with Max Romero's translation of his tape recorded conversation with Anguiano. Specifically, defendant Garcia testified that when Anguiano used the word "jale," he though Anguiano was taking about the suitcases, not marijuana, J.A. 129-30, and he stated that Anguiano never told him that there was marijuana in the suitcases. He also denied making the statement "cincuenta kilos," namely, "fifty kilos," during the conversation. Defendant Garcia stated that he never uses the word "kilo." J.A. 130.
 
 
 16
 In addition, defendant Garcia denied ever using the scales that the police seized from his house during the execution of the search warrant on May 15, 1994. J.A. 140-41. Further, he testified that he never conspired with Zeke Anguiano or anybody else from March of 1994 to May of 1994 to possess and distribute marijuana. J.A. 142.
 
 
 17
 Finally, Officer John Rojeski testified as a rebuttal witness for the government. Officer Rojeski stated that he was present in defendant Garcia's home on May 15, 1994, both during and after the execution of the search warrant, and that he had a conversation with defendant Garcia in the kitchen of his home after the warrant was executed. During that conversation, defendant Garcia admitted that he knew that the packages in the suitcases contained marijuana, J.A. 167, and that he knew this when the suitcases were brought into his home. J.A. 168.
 
 II.
 A.
 
 18
 Defendant Garcia argues that he was denied a fair trial by the admission of the testimony of investigating officer Detective Sergeant John Jose Gutierrez, who testified as to the street or slang meaning of the Spanish term "jale" when used in connection with a marijuana transaction. Specifically, defendant Garcia asserts that
 
 
 19
 [t]he government prior to the introduction of ... Gutierrez's testimony had agreed as to the accuracy of the court appointed translator Max Romero as well as having introduced evidence of Zeke [Anguiano] with reference to the translation. The Court appointed expert stated that jale has many meanings in the translation from Spanish to English, but did not state that it meant marijuana. Gutierrez's testimony was speculation and conjecture in that he did not participate nor was he present during the conversation. In a case where the Defendant's state of mind as to [k]nowledge with reference to possession which was hotly contested, the admission of said evidence was prejudicial, and not harmless.
 
 
 20
 Appellant's brief at 6.
 
 
 21
 This issue centers around a tape recorded conversation between a cooperating witness, Zeke Anguiano, and defendant Garcia, which occurred when Anguiano made the controlled delivery of two suitcases to defendant Garcia's home. The conversation was in Spanish, and an interpreter, Max Romero, transcribed and then translated the conversation between defendant and Anguiano into English. Prior to the testimony of Mr. Romero, the government stipulated to the accuracy of his translation and transcription of the audio tape recording. One of the passages in the transcription was: "Que horas son? Las doce? Te tengo ese jale." J.A. 162. In his translation, Romero interpreted that passage as stating: " 'What time is it? Twelve ... I have the stuff.' " Government Exhibit 11B; Tape Transcription at 2 (quoted in Appellee's Brief at 7). At trial, Romero testified that literally "jale" means "to pull." J.A. 165. However, he stated that when the word "ese" is used before the word "jale" it means "something material," i.e., it refers to a material object, and that it does not mean "a job," or "a lift your giving somebody." J.A. 165. Romero also testified that although the language used indicated that "jale" referred to something material, he did not know exactly "what it is," and he acknowledged that it could be anything. J.A. 166.
 
 
 22
 During his trial testimony, Zeke Anguiano reviewed the transcription and translation of his tape recorded conversation with the defendant. He noted that the phrase "Te tengo ese jale" had been translated as "I have the stuff." J.A. 78. Anguiano testified that in the drug trade "jale" has a particular meaning; namely, "it could mean marijuana or any other drug that they happen to be dealing." J.A. 80. He also testified that the term "jale" is used in the drug trade "just so that we don't blurt out 'marijuana' and stuff like that." J.A. 79.
 
 
 23
 The government also offered the expert testimony of Michigan State Police Detective Sergeant John Gutierrez. Detective Sergeant Gutierrez testified that he had 22 years of experience as a law enforcement officer and that five years of that experience related to narcotics. He estimated that he had been involved in excess of 200 narcotics cases, that he was fluent in Spanish, and that he was called in to help other police departments in cases involving Hispanic individuals who were unable to speak English. He further testified, over the defendant's objection, that he was fluent in the slang of Hispanic drug dealers and that whenever he had heard the term used in the context of a Hispanic drug transaction, " 'jale' means 'marijuana,' it means 'dope.' " J.A. 162. Defendant Garcia argues that the admission of Detective Sergeant Gutierrez's testimony was error because (1) Gutierrez's qualifications as a translator had not been established, and (2) Gutierrez's testimony was cumulative.
 
 
 24
 Rule 702 of the Federal Rules of Evidence ("Fed.R.Evid.") provides:
 
 
 25
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 26
 A "district court has broad discretion in admitting or excluding expert testimony. The court's decision is to be sustained on appeal unless it is manifestly erroneous." United States v. Carrazana, 921 F.2d 1557, 1567 (11th Cir.) (citing United States v. Brown, 872 F.2d 385, 392 (11th Cir.), cert. denied, 493 U.S. 898 (1989)), cert. denied, 502 U.S. 865 (1991). In United States v. Boissoneault, 926 F.2d 230 (2d Cir.1991), the Second Circuit stated that, based on Fed.R.Evid. 702, it had "held that experienced narcotics agents may explain the use and meaning of codes and jargon developed by drug dealers to camouflage their activities." Id. at 232. See Carrzana, 921 F.2d at 1567 ("Law enforcement officers may testify as to the meaning of slang or code words."). See also United States v. Castiello, 915 F.2d 1, 3 (1st Cir.1990) (" 'Lay jurors cannot be expected to be familiar with the lexicon of the [drug] community.' ") (quoting United States v. Hoffman, 832 F.2d 1299, 1310 (1st Cir.1987)), cert. denied, 498 U.S. 1068 (1991).
 
 
 27
 The district court's admission of Detective Sergeant Gutierrez's expert testimony was neither an abuse of discretion nor was it manifest error to admit the testimony. Romero, the translator, testified that the phrase "te tengo ese jale" did not necessarily mean "I got the stuff:" rather, the phrase "ese jale" referred to a material object, but he could not be sure what it was. Furthermore, witness Anguiano, who made the controlled delivery of marijuana to defendant Garcia's home, testified that when he used the term "jale" in his conversation with defendant Garcia, he was referring to "marijuana."
 
 
 28
 Thus, the testimony of Detective Sergeant Gutierrez was not cumulative, and it was offered to place the use of the term "jale" in a context for the jury. Detective Sergeant Gutierrez's expert testimony helped explain the drug jargon of Hispanic drug dealers to the jury. Here, the jury could not be expected to be familiar with drug jargon, and a jury whose members speak only English could not be expected to be familiar with the drug jargon used by Spanish speaking persons. Furthermore, translator Romero testified as to the general meaning of the word "jale," not as to the meaning of the word as it was used by Hispanic drug traffickers.
 
 
 29
 We also note that detective sergeant Gutierrez's testimony was relevant. Defendant Garcia testified that when Zeke Anguiano brought the two suitcases containing marijuana into his home during the controlled delivery, he was unaware that they contained marijuana. Thus the meaning of the word "jale" was highly relevant because the jury needed to determine whether, when Anguiano and defendant Garcia discussed "jale," they were referring to "stuff" or to "marijuana."
 
 B.
 
 30
 Defendant Garcia argues that the district court erred in enhancing his base level by two levels for obstruction of justice, namely, perjury, in the course of his trial testimony, pursuant to U.S.S.G. Sec. 3C1.1. Defendant asserts that in applying the enhancement, the district court failed to make the particularized finding of perjury required by the decision of the Supreme Court in United States v. Dunnigan, 113 S.Ct. 1111 (1993).
 
 
 31
 In deciding that the enhancement for obstruction of justice under U.S.S.G. Sec. 3C1.1 was warranted, the district court found:
 
 
 32
 Well, again we have the jury verdict on that, and to the extent the jury accepted the testimony of others and presumably rejected the testimony of Mr. Garcia, the jury is required to make those considerations beyond a reasonable doubt, and the Court is inclined to give great weight to the judgment of the jury, the Court also having heard that same testimony, and the Court believes the jury's verdict was appropriate, based on the testimony. And therefore the Court would conclude that Mr. Garcia attempted to obstruct justice by his testimony.
 
 
 33
 * * *
 
 
 34
 * * *
 
 
 35
 The Court has already ruled that based on the Court's recollection of the trial, that there was an obstruction of justice.
 
 
 36
 J.A. 179-80, 182.
 
 
 37
 A district court has discretion to determine whether perjury has occurred. United States v. Zajac, 62 F.3d 145, 148 (6th Cir.1995). However, "[o]nce a district court determines that obstruction of justice has occurred by perjury or other activities, ... it has no discretion, and must apply [U.S.S.G.] Sec. 3C1.1." Id. Further, the clearly erroneous standard applies to a district court's "application of Sec. 3C1.1," and the preponderance of the evidence standard applies to the district court's factual findings at sentencing., Id.
 
 U.S.S.G. Sec. 3C1.1 states:
 
 38
 If the defendant wilfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by two levels.
 
 
 39
 U.S.S.G. Sec. 3C1.1 (Nov.1994). The commentary to this guideline states in relevant part that "[t]he following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies: ... (b) committing, suborning, or attempting to suborn perjury. U.S.S.G. Sec. 3C1.1, comment., n. 3(b) (Nov. 1994) The commentary further states that "[i]n applying this provision in respect to alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant." U.S.S.G. Sec. 3C1.1, comment., n. 1 (Nov.1994).
 
 
 40
 In Dunnigan, the Supreme Court stated that a witness who testifies under oath or affirmation commits perjury "if [ ]he gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." Dunnigan, 113 S.Ct. at 1116. The Court further stated that "if a defendant objects to a sentence enhancement resulting from h[is] trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out." Id. at 1117. Moreover, according to the Court, "[w]hen doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding." Id. Nevertheless, the Court stated that "[t]he district court's determination that enhancement is required is sufficient ... if ... the court makes a finding of an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury." Id.
 
 
 41
 "A district court may not base a finding of perjury upon the mere fact that the jury returned a verdict of guilty after the defendant testified." United States v. Spears, 49 F.3d 1136, 1143 (6th Cir.1995) (citing Mathews v. United States, 11 F.3d 583, 586-87 (6th Cir.1993)). "To comply with the Supreme Court's directive in Dunnigan, the sentencing judge must identify for the record at least some specific instances of conflicting testimony and specify which portions of the defendant's testimony he finds materially perjurious." Spears, 49 F.3d at 1143 (citing United States v. Ledezma, 26 F.3d 636, 644-45 (6th Cir.), cert. denied, 115 S.Ct. 349 (1994)). "The judge must, at least briefly, explain why the intentional perjury was material." Id. "It is not enough for [the] sentencing judge to recognize conflicting testimony and resolve in his own mind which witness is credible." Id.
 
 
 42
 As we have earlier noted, Garcia's testimony, which covered denials of nearly every allegation made by the prosecution, was replete with instances in which the trial judge, who observed that he had heard the same testimony, could have concluded that Garcia had knowingly testified falsely to matters which were material to the question of his guilt or innocence. Nonetheless, we are left in some uncertainty whether the district court's findings as given could pass the test of Dunnigan and Spears. While we do not read Spears as requiring strict formality of application in which precisely quoted language of the defendant is found to have been perjurious, still we believe that the sense of the relevant cases requires something more specific than the generalized finding the court made here. Also, as a practical matter, this is especially helpful for our intelligent review of the issue on appeal. For this reason the case must be remanded for resentencing.
 
 III.
 
 43
 For the reasons stated, defendant Garcia's convictions are AFFIRMED, his sentences are REVERSED, and the case is REMANDED for resentencing consistent with this opinion.
 
 
 
 [1]
 Anguiano ultimately pled guilty to criminal charges arising out of his May 1994 arrest in the state of Missouri on September 7, 1994. He testified at the trial in this case under a grant of use immunity