NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0030n.06
Filed: January 9, 2008

No. 05-3330

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | On Appeal from the United |
| | ) | States District Court for the |
| v. | ) | Northern District of Ohio |
| | ) | |
| HOPETON WEBBER, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

**Before:**     **BOGGS, Chief Judge; COLE, Circuit Judge; and HOOD, District Judge.**[*]

**HOOD, DENISE PAGE, District Judge.**  Defendant-Appellant Hopeton Webber appeals

the judgment below.  For the reasons set forth in this opinion, we reverse the jury's finding as to the

amount of marijuana, but otherwise affirm the remaining findings.

### I.  OVERVIEW

Hopeton Webber, also known as Ricky Webber, was indicted on April 14, 2004, along with

seven defendants, on twenty-five counts in the Northern District of Ohio.  Webber was charged with

conspiracy to possess with the intent to distribute marijuana and cocaine, in violation of 21 U.S.C.

§ 846, and using a telephone to facilitate the commission of a drug trafficking offense, in violation

of 21 U.S.C. § 843(b).  On August 4, 2005, a federal grand jury returned a superseding indictment

---

* The Honorable Denise Page Hood, United States District Judge for the Eastern District of
Michigan, sitting by designation.

against Webber and the same co-defendants as in the original indictment. In addition to the same crimes charged in the original indictment, Webber was charged with an overt act and as a leader or organizer.

The jury trial begain on November 9, 2004. The jury returned a verdict of guilty on November 12, 2004 on counts 1, 14, and 22. Webber was sentenced to a term of imprisonment of 151 months and five years of supervised release on February 17, 2005. The trial court denied Webber's motion for a new trial and judgment of acquittal on December 1, 2004. Webber timely filed an appeal.

## II. FACTS

In November 2002, the Federal Bureau of Investigation ("FBI") began an investigation of Shelby Jones. Authorized interceptions of conversations conducted over Jones' cellular telephone established that Jones was supplied marijuana by an individual identified to Jones as Johnny Ouch, later identified as Walter Hines. Interception of conversations with Hines' cellular phone was later authorized.

Jones and Hines met in 1999. Hines began supplying Jones with marijuana in 2000, receiving 50 to 60 pounds on a regular basis. Jones paid Hines $1,150 to $1,250 per pound of marijuana. Jones came to learn that Hines' marijuana supplier was an individual named "Ricky Tin" or "Family." Although Jones never had any direct dealings with Hines' supplier, Jones claims he was approached by Webber at a local mall. Webber asked Jones about the money owed by Jones to Hines at that time in the amount of $58,000. After this encounter with Webber, Jones' supply from Hines was reduced. During the conspiracy period, Jones was supplied between 1,200 and 1,300 pounds of marijuana by Hines. Hines and Webber were childhood acquaintances.

2

Webber was born in Jamaica and immigrated to the United States in 1988. He was employed as an auto mechanic, but also worked nationally as a DJ, a promoter of reggae performers. Webber's real name is Kevin March, but his nickname is "Ricky" or "Ricky Tin." During a traffic stop in 1989, Webber showed an officer the identification of his cousin, Hopeton Webber, and the alias became part of his record. Webber claims he does not go by the nickname "Family." The term, "Family," is a generic greeting similar to "Brethren" or "Brother" used by Jamaicans when greeting each other. He is a thirty-eight-year-old father of nine children. Webber lived in Cleveland, Ohio, in his mother's two-family home, with her, as well as his wife, his children, and one nephew. Until December 2004, Nigel Chung, Webber's brother, lived in their mother's home also, occupying the third floor apartment.

Chung was in the home remodeling business and became involved in distributing marijuana for extra money. Webber supplied Chung with marijuana in 2003 and also assisted Webber with handling the finances, keeping records of the marijuana proceeds and amounts of money paid. Intercepted conversations confirmed that Webber directed Chung on matters relating to the collection and payment of money.

The recorded conversations were all in Jamaican *patois,*[1] which Webber claims is impossible for non-Jamaican speaking listeners to understand. The FBI used an agent to listen to and transcribe the conversations. The recordings were heard by the jury, and the transcripts were also admitted into evidence. Webber claims the government did not ask the court to find the agent qualified as an expert witness, but that the jury was later instructed that the agent had testified as an expert. The

---

[1] *Patois* - a) a dialect other than the standard or literary dialect. b) uneducated or provincial speech. [Merriam-Webster Online Dictionary].

3

government alleges that intercepted conversations between Webber, Hines, and Chung relating to the distribution of marijuana were coded, requiring the expertise of a drug investigator familiar with the investigation or case to interpret the codes used by the participants.

The government alleges that conversations between Webber and Hines established that Hines was subservient to Webber. Webber instead claims that the investigators stumbled across him and assumed his involvement. He was not a particular target of the investigation. In an affidavit requesting the search of Webber's home, the FBI described the residence as a "stash house" used by Hines and Chung to store drugs. However, when the search warrant was executed, the FBI found Webber's family asleep. No drugs or weapons were found in the home.

On February 2, 2004, Special Agent Todd DeKatech of the FBI requested assistance from the Drug Enforcement Administration ("DEA") in Tucson, Arizona, to conduct surveillance on Hines, who was traveling from Cleveland to Arizona. Deputy Sheriff Karen Couture of the Pima County Sheriff's Office, assigned to the Arizona DEA Task Force, along with other agents, conducted surveillance on Hines. Hines was followed from the airport to a residence located at 8550 South Snyder Road, Tuscon, Arizona.

Deputy Sheriff Couture was assigned on April 16, 2004 to serve an arrest warrant issued by the United States District Court for the Northern District of Ohio on Webber at the Snyder Road property in Tucson. Several officers, including FBI agents, went to the property to execute the arrest warrant. The property, a five-to-seven acre compound, contained a main residence (2,500 to 3,000 square feet), a smaller residence (1,100 to 1,200 square feet), a large workshop with a carport, and a swimming pool. After they arrived on the property to execute the arrest warrant, the officers were told that Webber was inside one of the houses. The officers knocked on the door and asked Webber

4

to come outside of the smaller residence. Webber was arrested as he came out of the smaller residence at the Snyder Road property. Four other individuals were in the smaller residence. The agents went into the smaller residence to secure the property and to perform a prospective search. Deputy Sheriff Couture thereafter obtained a search warrant for all the buildings and vehicles at the Snyder Road property based on what she observed from the outside of the building and what she was told by the FBI agents after the agents performed the prospective search and exited the smaller residence.

The search of the residences and other buildings revealed that the property was being used to pack and store marijuana. A closet located in the den of the main residence contained seven boxes containing bales of marijuana, packed in boxes with styrofoam and wrapped in plastic. Four fully loaded handguns, including two semiautomatic pistols from the smaller residence, and a zip lock bag full of marijuana were seized. In the garage were numerous boxes, marijuana seeds and residue on the ground, plastic wrapping paper, spent rolls of plastic tape, a trash bag full of unopened tape and duct tape. A 2000 Mercedez Benz with Florida license plates and a second vehicle with Ohio plates were parked in the carport.

Webber alleges Jones and Chung provided false testimony against Webber in exchange for testifying against him and for leniency. Jones testified he had received marijuana from Chung and Hines, but never from Webber. Chung testified that Webber supplied him of marijuana, but that Chung kept his own written records of the purchases and sales locked away in the attic of his mother's house. Chung also testified that Webber's nickname is "Ricky," but that the name "George" on his written records of drug activity actually referred to Webber, not anyone who was actually named George.

5

The pieces of evidence against Webber were the drugs and weapons discovered in the main house near the location of Webber's arrest. Webber claims that he had never set foot in the building where officers found large quantities of marijuana packed in boxes, as well as packing materials and scales. No fingerprints, testimony, or evidence connected Webber to these items, and Webber was never charged with possession of these items. Webber argues that evidence of their seizure was introduced against him without a limiting instruction. He further argues that there was no evidence connecting Webber with whoever owned or rented the property where the contraband was found. Webber's fingerprints were not found on the contraband or weapons, and none of his personal belongings were discovered at the Arizona residence. There was nothing to tie Webber to the drugs or paraphernalia found in the main residence.

Webber raises six issues on appeal: 1) the trial court erred in allowing into evidence the 210 pounds of marijuana and other contraband found in an unknown third party's house in Arizona; 2) the trial court erred in allowing expert testimony by an agent regarding decoding telephone conversations of Webber; 3) there was insufficient evidence to support a conviction for using a telephone to facilitate a felony; 4) there was insufficient evidence that the amount of marijuana exceeded 1,000 kilograms; 5) the prosecution committed misconduct during trial and at closing argument by the Assistant United States Attorney ("AUSA"); and 6) Webber was denied effective assistance of counsel. We address each issue below.

### III. ANALYSIS

#### A. Evidentiary Rulings

##### 1. Evidence found in Arizona

All evidentiary rulings are subject to the abuse-of-discretion standard of review. *United*

6

*States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002) (citing *United States v. Mack*, 258 F.3d 548, 553 & n.1 (6th Cir. 2001)). An abuse of discretion occurs when we are left with the "definite and firm conviction that the [district] court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors" or "where it improperly applies the law or uses an erroneous legal standard." *Id*. (citing *Huey v. Stine*, 230 F.3d 226, 228 (6th Cir. 2000) (citations and internal quotation marks omitted)).

Webber argues that the jury heard evidence that quantities of marijuana, weighing equipment and packing materials were discovered in a building but not the building in which Webber was found when he was arrested by authorities. Webber asserts that this information was prejudicial and resulted in an unfair proceeding. Webber contends that the jury also heard that four firearms were found in the smaller residence that Webber visited, but that the weapons were hidden and were never handled or possessed by Webber or a co-defendant. Webber argues that the court erred by permitting the jury to hear testimony pertaining to the marijuana packing operation, the scales found at the main residence, the numerous photos of the handguns and bales of marijuana, although no fingerprints belonging to Webber were found in these locations. Webber also argues that there was no suggestion that he knew the renter or owner of the marijuana house or the activities transpiring in the main residence. Webber further argues that the trial court erred in failing to give a limiting instruction on the evidence found at the Arizona compound. Finally, Webber argues that all of these items were sent to the jury room in violation of Fed. R. Evid. 402.

The government argues that a review of the evidence presented at trial revealed that the evidence was relevant and that there was a connection between the items seized at the Arizona compound and Webber. The government claims that evidence established that Webber supplied

marijuana to Hines and Chung and that Chung handled large amounts of marijuana proceeds for Webber; that Special Agent DeKatch observed Hines boarding the plane for Phoenix, Arizona; and that surveillance agents followed Hines to the premises where Webber was arrested. The government states that Webber was observed leaving the smaller residence. The government argues that all of this evidence established that the compound was being used for packaging and processing marijuana; that these facts and evidence were charged as overt acts in the conspiracy count of the indictment against Webber; and that possession of the marijuana, packaging material, and firearms was part of the conspiracy and thus was circumstantial evidence of actions by the co-conspirators in furtherance of the conspiracy.

Relevant evidence is generally admissible while irrelevant evidence is inadmissible. Fed. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Fed. R. Evid. 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed, *inter alia,* by the danger of unfair prejudice or misleading the jury. This court gives the district court broad discretion to determine whether or not to admit evidence based upon considerations of relevance and materiality. *United States v. Walton,* 909 F.2d 915, 925 (6th Cir. 1990); *United States v. Phillips,* 575 F.2d 97, 100 (6th Cir. 1978). *See United States v. Stull,* 743 F.2d 439, 445 (6th Cir. 1984) (because the district court's determinations of relevancy depend on the exercise of considerable judgment within the context of the entire trial, appellate courts should not lightly overrule the trial court's decision). We will reverse a district court's decision to admit evidence based on considerations of relevance and materiality only if the district court abused its discretion. *Walton,* 909 F.2d at 925; *United States v. Schrock,* 855

F.2d 327, 333 (6th Cir. 1988).

The marijuana and other contraband found in buildings where Webber was not found, and the guns found hidden in the building where Webber was found, are relevant to the charge of conspiracy. In a drug conspiracy conviction, the essential elements are: (1) an agreement to violate drug laws, (2) knowledge and intent to join in the conspiracy, and (3) participation in the conspiracy. *United States v. Taylor*, 248 F.3d 506, 515 (6th Cir. 2001); *see United States v. Welch*, 97 F.3d 142, 148-49 (6th Cir. 1996). "A conspiracy may be inferred from circumstantial evidence that can be reasonably interpreted as participation in the common plan." *United States v. Pierce*, 62 F.3d 818, 826 (6th Cir. 1995) (citing *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989)).

Webber argues that he was unduly prejudiced by the admission of this evidence because he was not found in the main residence of the compound. In *United States v. Rey,* 923 F.2d 1217 (6th Cir.1991), the defendant argued that the admission of items, such as a mobile phone, beeper, answering machine, CB radio, cassette recorder, and certain books was irrelevant and prejudicial. The court reasoned that a collection of items made the charge more probable and therefore was relevant evidence. *Rey,* 923 F.2d at 1221. The same is true of the marijuana, packaging materials in the buildings other than where Webber was found, and the guns found in the residence where Webber was found. All of this evidence is indicative of customs and tools of the drug trade. The existence of this evidence makes the charge of conspiracy to distribute illegal drugs more probable, therefore, it is relevant.

With regard to prejudice, *Rey* stated: "[t]he trial court has broad discretion in deciding admissibility issues under Rule 403. In order to exclude evidence under Rule 403, the evidence must be more than damaging; it must be unfairly prejudicial. Unfair prejudice means an undue tendency

9

to suggest a decision on an improper basis." *Id.* at 1222 (citations omitted). The evidence in this case was certainly damaging to the defense but we do not think it was unfairly prejudicial. The marijuana and contraband recovered from buildings where Webber was not found and the guns hidden within the building where Webber was found were all within the same compound. The testimony from the agents and officers was that although there were different buildings in the property, the buildings were part of one compound. These relevant facts are facts from which the jurors could draw their own inferences. We conclude that there was no undue prejudice resulting from the admission of this evidence.

### 2. Expert Testimony

Webber argues that the testimony of Special Agent Kenneth Riolo as to the coded language used by Webber and Hines in their wiretapped telephone conversations was in error because it was not reliable, and Special Agent Riolo had insufficient expertise to translate the specific slang words or jargon used in the conversations. Webber states that although the government did not explicitly offer Special Agent Riolo as an expert witness during trial, he was permitted to give his opinion about the meaning of words used by the Defendants, and that the jury was later instructed that he had testified as an expert. Webber contends that Special Agent Riolo's testimony resulted in an unfair proceeding in violation of his due process rights.

The government states that it presented testimony of Special Agent Riolo pursuant to Fed. R. Evid. 702, to explain codes and jargon used by Webber and Hines in intercepted conversations. The government contends that under Rule 702, Special Agent Riolo was qualified as an expert on the basis of his extensive training and experience in narcotics investigations, including a large number of wiretap cases and several marijuana cases. Some of the cases involved Jamaican

nationals. The government argues that Special Agent Riolo was involved in the case as co-case agent and his duties included reviewing the intercepted calls in order to identify the individuals involved in the illicit activities and their involvement in drug trafficking activities, which included being able to determine when the conversations related to drug trafficking activities. The government states that coded language was used by Webber, Hines, and Chung during marijuana related conversations. The government contends that the words or phrases used by Webber, Hines, and Chung would not mean anything to a juror, unless the codes used were explained by an expert in drug investigations with knowledge of the specific case. The government cites *United States v. Garcia*, 72 F.3d 130, 1995 WL 712757 *5 (6th Cir. Dec. 4, 1995) (unpublished), for the proposition that "experienced narcotics agents may explain the use and meaning of codes and jargon developed by drug dealers to camouflage their activities."

The standard of review of a district court's evidentiary rulings, including those made under Fed. R. Evid. 701 and 702, is abuse of discretion. *United States v. White,* 492 F.3d 380, 398 (6th Cir. 2007). Even if the district court erroneously admitted evidence, we reverse only if the ruling affects a substantial right of a party. *Id.*

The district court did not abuse its discretion or manifestly err by allowing the testimony of Special Agent Riolo as to the words or jargon used in the intercepted conversations. Special Agent Riolo testified that he had been assigned to the drug squad of the FBI for 17 to 18 years. (Joint Appendix ("J.A.") at 644). He had received specialized training in several areas, such as major case investigations, drug schools, drug identification, undercover group investigations, Title III (wiretap investigations), etc., and has been involved in hundreds of narcotics investigations. (J.A. at 644-45). Chung identified Webber's voice on the intercepted conversations. (J.A. at 650-51). Special Agent

11

Riolo testified as to what the language and jargon meant in the intercepted phone conversations, but as mentioned previously, Webber's counsel stipulated to the authenticity of the transcriptions and the accuracy of the translations. (J.A. at 338-39).

Given Special Agent Riolo's experience in drug investigations, it was not manifestly erroneous for him to provide expert testimony based upon the recorded phone conversations.

## B.     Sufficiency of Evidence

### 1.     Intercepted Telephone Conversations

Webber argues that if he had been a conspirator in the drug trafficking business, he would have been caught discussing drugs or money in the intercepted phone conversations. Webber claims that the government developed a theory that Webber's phone conversations were deliberately coded to sound like those made by ordinary people, and that this was not a reasonable conclusion.

The government argues that the evidence in support of these charges included the actual recordings of intercepted conversations containing Webber's voice and the narcotics investigator's opinion of the coded language used in the conversations. The government contends that it was the ultimate decision of the jury to determine what weight to give the interpretations of the intercepted conversations, and whether or not the conversations were in furtherance of the conspiracy.

The standard of review for insufficient evidence claims is whether, after viewing the facts in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Sykes*, 292 F.3d 495, 498-99 (6th Cir. 2002) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

Webber did not contest the authenticity of the transcriptions or the accuracy of the transcriptions of the recorded conversations because Webber's strategy was to argue that the voice

12

on the recorded conversations was not Webber. (J.A. at 338-39). Viewing the facts in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of using a telephone to facilitate a felony beyond a reasonable doubt.

### 2. Amount of Marijuana

The jury determined that Webber possessed over 1,000 kilograms of marijuana. Webber argues that the quantity of drugs found by the jury could only have been based upon the testimony of Jones and Chung. Based on the testimony of Jones and Chung, Webber claims that the largest amount of marijuana that could be attributed to him is 1,810 pounds and that the government is required to prove Webber possessed about 2,200 pounds to meet the 1,000 kilograms found by the jury.[2] The government argues that if the drug proceeds are taken into account, along with poundage testified to by Jones and Chung, the monetary amounts support the jury's determination that Webber possessed 1,000 kilograms of marijuana.

Again, the standard of review for insufficient evidence claims is whether, after viewing the facts in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Sykes*, 292 F.3d at 498-99.

The testimony at trial established that 210 pounds of marijuana was seized at the Arizona residence.[3] Jones testified that during the time he dealt with Hines, he purchased as much as 1,300 pounds of marijuana. (J.A. at 522). Chung testified that the initial amount of marijuana that he received from Webber was 100 pounds. (J.A. at 560). Chung also testified that he picked up a shipment for Webber of 50 pounds on one occasion (J.A. at 558), and gave a supplier of Webber

---

[2] 1 lb./ 2.2 = 1 kg.

[3] Neither party disputes that 210 pounds of marijuana was seized at the Arizona residence.

13

$27,000.00 on another occasion. (J.A. at 559). Chung testified that he counted money from Hines on two occasions at $29,000.00 and $42,000.00 respectively. (J.A. at 561). Chung testified to a ledger that he maintained which indicated a total of $153,500.00 in marijuana proceeds representing money Webber told Chung to keep and money from Hines. (J.A. at 564-65). Chung testified that when he purchased marijuana from Webber, he paid approximately about $1,100.00 to $1,200.00 per pound. (J.A. at 555). Finally, in 2003, Chung testified that he purchased 150 pounds from Webber. (J.A. at 570).

Adding the pounds of marijuana established at trial, the total is 1,810 pounds (210 + 1,300 + 100 + 50 + 150) or 822.73 kilograms of marijuana. The total dollar amount, without the ledger amount, equals $98,000.00 ($27,000.00 + $29,000.00 + $42,000.00). (J.A. at 559, 561). Adding the ledger amount referenced by Chung's testimony of $153,500.00, the total dollar amount gleaned from the trial is $251,500.00.

The government's brief, at page 32, argues that account should also be taken of an additional amount of "a balance of $175,000 carried forward . . . ." However, that amount does not appear anywhere in the cited material, nor any other place that we could ascertain from the record. The brief also claims that "conversations intercepted . . . mentioned amounts of drug proceeds, possessed or to be collected for a total of $281,000." However, the government does not indicate how that figure is derived, and our own inspection of the material cited for this amount can substantiate, being extremely charitable, no more than $82,000.00. *See* J.A. 580.

The largest dollar amount that any rational juror could arrive at is the $251,500.00 from the previous paragraph, plus $82,000.00. Even if we take the lowest value of marijuana, $1,150.00 per pound, we arrive at an equivalent of 290 pounds of marijuana which, added to the 1,810 pounds of

14

physical marijuana discussed above, amounts to 2,100 pounds, still falling short of the necessary 2,200 pounds required to support of finding a 1,000 kilograms. Viewing the evidence in the light most favorable to the government, there was insufficient evidence for the jury to find that Webber was involved in a conspiracy to possess with the intent to distribute more than 1,000 kilograms of marijuana.

**C.     Prosecutorial Misconduct**

Webber argues that the government was aware that Webber had nothing to do with the drugs, paraphernalia, weapons, or the Mercedes-Benz found in Arizona, but allowed this testimony during trial and did not attempt to correct the allegedly false statements. Webber contends that the government's argument that Webber was discovered in the presence of 210 pounds of marijuana was a misleading argument. Webber also argues that evidence pertaining to the weapons seized at the house in Arizona, where Webber was arrested, misled the jury.

Webber objects to numerous comments made by the government during closing argument. Specifically, Webber alleges that Plaintiff-Appellant repeatedly referred to his decision not to testify, commented about Webber's relationship with his children, and addressed issues of the moral ills of our society, creating unfair prejudice. Webber argues that the comments made by the government were cumulative and require a new trial.

The government argues that a review of the evidence presented at trial proves that Webber was the supplier of marijuana in the drug conspiracy and was connected to the Arizona property where he was arrested. The government contends that based upon circumstantial evidence, a reasonable inference could be drawn that Webber was a participant in the marijuana packaging activities at the Arizona property. In regards to the firearms, the government states that firearms

15

have been recognized to be tools of the drug trade and cites *United States v. Ware*, 161 F.3d 414, 417 (6th Cir. 1998) and *Jennings v. Rees*, 800 F.2d 72, 75 (6th Cir. 1986). The government states that the Mercedez-Benz was found on the Arizona property with ties to Webber. The government contends that its arguments were based upon reasonable inferences made from the evidence presented.

The government states that there was no objection to the comments about Webber's relationship with his children, and therefore this claim of prosecutorial misconduct is reviewed only for plain error, citing *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994). The government notes that Webber's children were present during the trial and were mentioned by defense counsel. The government asserts that the comments were made to emphasize to the jury that they should decide the case without sympathy or emotions, and referred to facts elicited by Webber's counsel that Webber traveled extensively and was never home.

In terms of Webber's assertion that the government referred to his decision not to testify, the government states that Webber's voice was identified in court by Chung and Special Agent Riolo. Webber's counsel argued in closing arguments that the identification of Webber's voice in the recordings played in court was in dispute because Chung was lying, and Special Agent Riolo had never spoken to Webber. The government, as counter argument, stated that the voice identification was not in dispute, and that the AUSA's comment concerning the identity of the speaker was not a reference to Webber not testifying, but was referring to the lack of contradiction to the voice identification. The government points out that the court gave a jury instruction emphasizing that the burden of proof on the issue of voice identification was on the government and that Webber was not obligated to present any witnesses.

16

In regards to the AUSA's soliloquy pertaining to the moral ills of society, the government argues that the comments were timely objected to and sustained. The government also points out that the court gave an instruction that the soliloquy was inappropriate and gave an instruction to disregard it to the jury.

Whether statements amount to prosecutorial misconduct and whether they rendered the trial fundamentally unfair are mixed questions of law and fact and are therefore reviewed *de novo*. *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999) (citing *United States v. Clark*, 982 F.2d 965, 968 (6th Cir. 1993)). When reviewing claims of prosecutorial misconduct, we determine first whether the statements were improper. *Id*. (citing *United States v. Krebs*, 788 F.2d 1166, 1177 (6th Cir. 1986)). If they appear improper, we then look to see if they were flagrant and warrant reversal. *Id*. To determine flagrancy, we determine: 1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused. *Id*. at 549-50 (citing *United States v. Monus*, 128 F.3d 376, 394 (6th Cir. 1997)). To reverse a conviction because of an improper non-flagrant statement, we must determine that: 1) the proof of the defendant's guilt is not overwhelming; 2) the defense counsel objected; and 3) the trial court failed to cure the impropriety by failing to admonish the jury. *Id*. Improper comments made by the prosecutor without objection from the defense are reviewed for plain error. *United States v. Sloan*, 833 F.2d 595, 598 (6th Cir. 1987). "The plain error doctrine mandates reversal only in exceptional circumstances and only where the error is so plain that the trial judge and prosecutor were derelict in countenancing it." *Id*. (quotation and internal marks omitted).

17

We have previously found that there was sufficient evidence to find that Webber was involved in a drug conspiracy. The drugs, paraphernalia, weapons, and the Mercedes-Benz found in Arizona could be inferred as part of the drug conspiracy. Webber has offered no evidence to demonstrate that the government was aware that Webber had nothing to do with these items. To the contrary, the government presented circumstantial evidence which the jury found linked Webber to the drug conspiracy. In addition, Webber was arrested in a property located in Arizona where the drugs, paraphernalia, weapons, and the Mercedes-Benz were located. The statements of the government in this regard were not improper.

Webber's claims that the AUSA commented unfairly about Webber's decision not to testify are not substantiated by the record. Webber's assertion that the government made improper comments on his decision not to testify is based upon comments made during closing argument stating that "I didn't hear anybody disputing the identity of his [Webber's] voice." (J.A. at 797-98). This statement, taken in the context of the government's closing argument, made no reference to Webber's failure to testify. The comment appears to have a relation to Webber's trial strategy which, as mentioned previously, was to deny that he was the voice which was heard in the intercepted phone conversations. Webber's brother testified that it was Webber's voice in the recordings played in court. Although the comment was not objected to by Webber's counsel, the district court gave a curative instruction to the jury. (J.A. at 810-11). This comment does not warrant a reversal of Webber's conviction.

The AUSA's comments pertaining to Webber's relationship with his children were also not improper. Although Webber argues that the comments were improper because Webber alleges that it suggested that Webber deserved a conviction for his personal failings, not whether or not the

18

elements of the offense were proven, this is not substantiated by the record.[4]  There was sufficient

evidence presented which would allow the jury to return a conviction in this matter.  The comments

were not improper and not significant enough to rise to the level required to find prosecutorial

misconduct.  There was sufficient evidence to otherwise allow the jury to reach a verdict.

Finally, the AUSA's comment about the moral ills of our society was improper and objected

to by Webber's counsel. (J.A. at 807).  A curative instruction was given by the district court.  (J.A.

at 810).  This comment does not warrant a reversal of Webber's conviction.

## D.       Ineffective Assistance of Counsel

Webber asserts that although it is true that the appellate court generally defers challenges

based upon ineffective assistance of counsel to § 2255 proceedings, this case is unusual and there

is enough evidence presented in Webber's letters to the court and the government sufficient for this

court to review the claim on appeal.

The government contends that Webber's ineffective assistance of counsel claim may not be

raised for the first time on direct appeal unless the record is sufficiently developed to address the

---

[4] In his closing argument, Plaintiff-Appellee stated:

> ... He [Defendant-Appellant] is the one who got him [Chung] into this.  He is the real culprit in this conspiracy.  He is the supplier. Would you do that to your brother?  Would you involve your brother? Would you keep him out?  Would you bring your kids into Court if you are charged with a crime?  Would you bring your kids in to get sympathy from the jury?

> I asked you initially: Can you put the sympathy aside?  All of us are human, of course.  What kind of father is he?  He is never home.  He is traveling.  Where to?  We don't know.  At least, we know - - we know that he was in Florida gambling some tine ...

(J.A. at 798-99)

19

claim and cites *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997) for this proposition. The government argues that Webber's ineffective assistance of counsel claims can be more fully developed on collateral review under § 2255.

Traditionally, ineffective assistance of counsel claims are not cognizable on direct appeal. *Pierce*, 62 F.3d at 833; *Aguwa*, 123 F.3d at 423. The proper avenue for raising such claims is through collateral attack on the conviction pursuant to 28 U.S.C. § 2255. *Pierce*, 62 F.3d at 833. (citing *United States v. Goodlet*, 3 F.3d 976, 980 (6th Cir. 1993)). This rule stems from the fact that a finding of prejudice is a prerequisite to a claim for ineffective assistance of counsel, and appellate courts are not equipped to resolve factual issues. *Aguwa*, 123 F.3d at 423 (citations omitted). If the parties have adequately developed the record, however, the court can elect to hear the issue on direct appeal. *Pierce*, 62 F.3d at 833 (citing *United States v. Wunder*, 919 F.2d 34, 37 (6th Cir. 1990)).

We find Webber's ineffective assistance of counsel claim is more appropriate for collateral review.

## IV. CONCLUSION

For the reasons set forth above, we reverse the jury's finding that Webber possessed 1,000 kilograms of marijuana, but otherwise affirm the remaining findings. We remand for further proceedings consistent with this opinion.