**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Roy TAYLOR, Defendant–Appellant.**

No. 96–2472.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1997.

Decided April 8, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied May 6, 1997.

Lawrence S. Beaumont (argued), Office of the United States Attorney, Urbana, IL, for Plaintiff–Appellee.

Jeffrey Urdangen (argued), Marion Buckley, Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and FLAUM and EVANS, Circuit Judges.

EVANS, Circuit Judge.

Roy Taylor is a man of many talents, but unfortunately he has ended up as just one of many drug dealers spending a long time—324 months—in a federal prison for conspiracy to distribute a controlled substance, in his case heroin.

Taylor was the self-proclaimed "five star" Chief of the Vice Lords, a gang in Kankakee, Illinois. But Taylor was also the minister of a church, the owner of a restaurant, and a partner in a car wash. He admits he employed addicts and dealers at the car wash; in fact, it was a front for heroin sales. He has been convicted of six felonies (none of them violent, he says), including one for possession of cocaine with intent to distribute. At the time of the indictment in this case he had a charge pending in Chicago for delivery of a controlled substance. He also has 14 other criminal arrests that did not result in convictions.

Despite (or maybe because of) his nefarious reputation, Taylor was on speaking terms with the Kankakee police chief and was a witness for the state in a murder case. To add to this mix, before her death in a drive-by shooting, Taylor was married to a woman named Tamala Kirk. Tamala was an active church woman, an evangelist, and a police informant. She worked as an informant for, among others, Laurence Beaumont, an assistant state's attorney from Kankakee, who successfully prosecuted Taylor in state court for cocaine possession in 1989. It seems Tamala also did some interior decorating work for Beaumont and that he had, on occasion, stopped at Taylor's home in Kankakee. Eventually Beaumont moved to Danville and took a job as an assistant United States attorney in the Central District of Illinois.

This somewhat unusual situation, a cozy situation if you will, explains why Taylor went to talk to Beaumont when he got wind that a possible indictment against him was about to be returned. This chat, eventually, provided support for a finding that Taylor was responsible for the delivery of 100 grams of heroin per week during the course of the conspiracy in this case.

The drug quantity finding is one of the bases for Taylor's appeal of his sentence after he pled guilty to three heroin distribution charges. He contends that he should only be held responsible for 50 grams per week, which would lower his base offense level under the United States Sentencing Guidelines. The other issues he raises are what he sees as an improper enhancement to his sentence for a coconspirator's possession of a firearm during a drug transaction, and an enhancement for his role as a leader of a drug conspiracy involving five or more participants or one that was "otherwise extensive." He also contends that his attorney did not have a meaningful opportunity to present an argument at sentencing.

■■■ Judge Harold Baker held a 6–hour sentencing hearing, at the end of which he determined, among other things, that the drug quantity set out in the presentence report was correct. Taylor and his coconspirators were held responsible for distributing 100 grams of heroin a week for 43 weeks, or 4.3 kilograms. Taylor's challenge to this finding faces an uphill battle, for we will not disturb factual determinations as to the amount of drugs attributable to a conspiracy unless we find clear error; i.e., we will look favorably on the attack only when the entire body of evidence leaves us with the definite and firm conviction that a mistake has been committed. *United States v. Duarte*, 950 F.2d 1255 (7th Cir.1991), *cert. denied*, 506 U.S. 859, 113 S.Ct. 174, 121 L.Ed.2d 120; *United States v. Howard*, 80 F.3d 1194 (7th Cir.1996).

One of the bases for Judge Baker's drug quantity finding is a report of Taylor's own words, words which he disclaimed at sentencing. As we noted, for some reason—perhaps related to Taylor's multifaceted life—he

called AUSA Beaumont two days before he was indicted to see what was up because a woman he knew had received a grand jury subpoena with Beaumont's telephone number on it. Beaumont told Taylor to come to his office the next day. When Taylor arrived, he talked with Beaumont and Special Agent Paul Vido of the Bureau of Alcohol, Tobacco, and Firearms. According to Vido's account of that meeting, Taylor said he distributed 100 to 200 grams of heroin per week and sometimes as much as 400 or 500 grams. The heroin came from a Nigerian named Fleming. At sentencing, Taylor disputed this account and said that the most heroin he received from the Nigerian was one ounce at a time. According to Taylor's account of the meeting, Beaumont was not interested in drug dealing but only in holding Taylor responsible for Tamala's death. It appears that Taylor thought he was going to be able to negotiate with Beaumont, perhaps by giving him information about other shootings, which may explain why Taylor talked with him in the first place. But as Taylor says, "[H]e [Beaumont] wasn't cooperating. He wasn't dealing with me in any type of way."

Judge Baker found Vido's account of what was said at the meeting to be more credible than Taylor's later recantation. That is a call the judge is entitled to make. Vido's account of the meeting is also supported by other evidence. Police intelligence sources said that Taylor was in charge of the heroin trade in Kankakee, and two informants claimed he was bringing in four to five ounces (112 to 140 grams) per week. Then there is the estimate of the number of addicts in the area—400—and the estimate that the majority of them use a half-gram of heroin per day.

Relying on *United States v. Beler*, 20 F.3d 1428 (7th Cir.1994), Taylor also says that in calculating the quantity of drugs, a district judge is required to err on the side of caution, which would mean that he could be held responsible for only 50 grams per week. Why? Because of the testimony of Darryl Hicks at Hicks' guilty-plea hearing. Hicks said that the conspiracy distributed between 50 and 100 grams per week. Erring on the side of caution would mean, Taylor says, that

he could be held responsible for only 50 grams of heroin per week. If Hicks' testimony were all that existed in the record, the argument might fly, for a court must err on the side of caution when confronted with a number of plausible estimates of drug quantity, "none of which is more likely than not the correct quantity." *Beler*, quoting *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir.1990). However, here there is other evidence, giving the higher estimate increased plausibility. Judge Baker's finding regarding drug quantity is not clearly erroneous.

■■■ Taylor also objects to the enhancement he received based on a coconspirator's possession of a firearm during a drug deal. Section 2D1.1(b)(1) of the sentencing guidelines provides for a 2–level enhancement for the possession of a dangerous weapon during the commission of a drug offense unless it is clearly improbable that the weapon was connected with the offense. See U.S.S.G. § 2D1.1 comment. A defendant can be held responsible for a codefendant's possession of a weapon if that possession was in furtherance of the jointly undertaken criminal activity and was reasonably foreseeable by the defendant. *United States v. Berchiolly*, 67 F.3d 634 (7th Cir.1995). As we did on the drug quantity issue, we review the district court's factual determinations on this point for clear error. *United States v. Banks*, 987 F.2d 463 (7th Cir.1993).

The enhancement here was based on Keith Schweikle's possession of a .38 caliber Smith and Wesson handgun during a drug sale. At Taylor's sentencing proceeding, Schweikle testified that Taylor, whom he had known "for a while" through the Vice Lords, asked him to come to Kankakee to assist with some problems Taylor was having with another gang, the Gangster Disciples. The problems involved shootings: "the problems was indicated like ... a couple of my buddies got shot." Taylor wanted Schweikle to provide security, and to that end Schweikle worked at the car wash and became Taylor's body guard. Taylor provided Schweikle with the .38. When Schweikle entered his guilty plea to the charges in this indictment, he testified that he accompanied Hicks (a member of the drug conspiracy) on September 6, 1994, when

Hicks sold heroin to a buyer who turned out to be a confidential informant. Schweikle was carrying the .38 at the time in order to provide security.

The evidence clearly supports the conclusion that Taylor gave the gun to Schweikle so Schweikle could, in turn, provide security for the drug operation. His carrying of the gun in connection with a drug transaction was not just foreseeable, it was inevitable. Based on this record we cannot find clear error in the adjustment for the possession of a dangerous weapon.

■■■■ Taylor also objects to the finding, pursuant to U.S.S.G. § 3B1.1(a), that he held a leadership role in the criminal activity at issue here. The finding resulted in a 4–level enhancement to Taylor's base offense level under the guidelines. Again, we review the district court's factual findings regarding a defendant's role in the offense for clear error. *United States v. Lewis,* 79 F.3d 688 (7th Cir.1996).

There is a certain irony to this claim. On the one hand, Taylor is the self-proclaimed Chief of the Vice Lords in Kankakee. Others attributed a similar rank to him. For instance, Hicks said Taylor was a "five star universal elite." When asked to define that title in ordinary lingo, Hicks said, "Well, in everyday language he had a lot of power. He wielded a lot of power. Once he became a chief, then his power was unlimited." Evidence suggests that Taylor's organization, the Vice Lords, had a monopoly on the white heroin (white heroin is a form of heroin that is both very pure and potent) trade in Kankakee. Schweikle said that the car wash employees were Vice Lords and were selling heroin out of that establishment. Yet for sentencing purposes Taylor claims that he was not a leader of five or more people. The claim must be rejected.

It is easy to find four participants. Taylor himself testified at sentencing that Hicks, Maurice McBride, and Gerald Pankey sold drugs for him. Taylor also acknowledged that Schweikle worked for him. Combining that acknowledgment with Schweikle's description of his job means that Schweikle can be added to the list of participants. Hicks,

McBride, and Schweikle all entered guilty pleas to the indictment in this case.

Then there are the rest of the Vice Lords. Hicks testified that there were sometimes 30 to 40 members and sometimes 10 to 15 members. According to Agent Vido's notes of the statement Taylor gave, Taylor himself said that everyone at the car wash sold heroin for him. ATF Agent Michael Casey testified that he interviewed five members of the conspiracy who confirmed allegations against Taylor. Casey also said that over the course of the investigation he personally knew about 10 people who were working for the Taylor drug organization, including Otis Kelly, Joe Taylor, Taronse Grant, Derrick Potts, and a person called JB. We cannot find clear error in a finding that Taylor was a leader of an organization with five or more participants, nor would it be error to conclude that the criminal activity was otherwise extensive.

■■■■ The final issue Taylor raises is that his attorney did not have an opportunity to present argument at sentencing. Strictly speaking, this claim is true. The judge told Taylor's attorney:

> [Y]ou may make objections in addition to what you have raised in the record, offer evidence in mitigation, and make a recommendation to the court.

The problem, as Taylor sees it, was that this invitation was given after the judge had fairly clearly indicated what his findings were going to be.

Nevertheless, we cannot agree that the invitation offered by the judge to Taylor's counsel was meaningless. The judge had heard six hours of testimony and had taken guilty pleas from Taylor, Hicks, McBride, and Schweikle. He was acquainted with the facts of the case. He indicated what his findings were likely to be and then asked for objections to them. This was not necessarily an empty invitation and, in fact, in certain situations it may even be an efficient and just way to proceed. For instance, if the judge had said he was inclined to find that Taylor was accountable for only the 50 grams per week which were conceded, defense counsel would not have had to waste time trying to pick the record apart. That the judge told counsel up front that he was inclined to go

the other way doesn't mean that Taylor's right to be effectively represented by counsel was impaired. The judgment of the district court is AFFIRMED.