**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 10a0612n.06

No. 08-4283

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Sep 15, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **ON APPEAL** FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| HOPETON WEBBER, aka RICKY WEBBER, | ) | |
| | ) | **O P I N I O N** |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE:  GILMAN and WHITE, Circuit Judges, and THAPAR[*], District Judge.**

**HELENE N. WHITE, Circuit Judge.**  After trial by jury, defendant Hopeton Webber

("Webber") was convicted of possession with intent to distribute marijuana in violation of 21 U.S.C.

§§ 841(a)(1) & (b)(1)(A), and using a telephone to commit a felony in violation of 21 U.S.C. §

843(b).  Webber appealed, and this court affirmed in part, reversed in part, and remanded for

resentencing.  Webber now appeals from his resentencing, asserting that the district court committed

error in its determination of the amount of marijuana attributable to him, in imposing an

enhancement for his leadership role in the conspiracy, and in failing to adequately consider several

18 U.S.C. § 3553(a) sentencing factors.  Based on our analysis of the first issue, we **REVERSE** and

**REMAND** for resentencing, and we therefore do not reach Webber's other sentencing claims.

---

[*]The Honorable Amul R. Thapar, United States District Judge for the Eastern District of
Kentucky, sitting by designation.



**I.**

A.

As described more fully below, Webber appeals from resentencing after this Court reversed and remanded his original sentence. The underlying facts that led to Webber's conviction were previously described by this Court in Webber's initial appeal:

> In November 2002, the Federal Bureau of Investigation ("FBI") began an investigation of Shelby Jones. Authorized interceptions of conversations conducted over Jones' cellular telephone established that Jones was supplied marijuana by an individual identified to Jones as Johnny Ouch, later identified as Walter Hines. Interception of conversations with Hines' cellular phone was later authorized.
>
> Jones and Hines met in 1999. Hines began supplying Jones with marijuana in 2000, receiving 50 to 60 pounds on a regular basis. Jones paid Hines $1,150 to $1,250 per pound of marijuana. Jones came to learn that Hines' marijuana supplier was an individual named "Ricky Tin" or "Family." Although Jones never had any direct dealings with Hines' supplier, Jones claims he was approached by Webber at a local mall. Webber asked Jones about the money owed by Jones to Hines at that time in the amount of $58,000. After this encounter with Webber, Jones' supply from Hines was reduced. During the conspiracy period, Jones was supplied between 1,200 and 1,300 pounds of marijuana by Hines. Hines and Webber were childhood acquaintances.
>
> Webber was born in Jamaica and immigrated to the United States in 1988. He was employed as an auto mechanic, but also worked nationally as a DJ, a promoter of reggae performers. Webber's real name is Kevin March, but his nickname is Ricky" or Ricky Tin." During a traffic stop in 1989, Webber showed an officer the identification of his cousin, Hopeton Webber, and the alias became part of his record. Webber claims he does not go by the nickname Family." The term, "Family," is a generic greeting similar to "Brethren" or "Brother" used by Jamaicans when greeting each other. He is a thirty-eight-year-old father of nine children. Webber lived in Cleveland, Ohio, in his mother's two-family home, with her, as well as his wife, his children, and one nephew. Until December 2004, Nigel Chung, Webber's brother, lived in their mother's home also, occupying the third floor apartment.
>
> Chung was in the home remodeling business and became involved in distributing marijuana for extra money. Webber supplied Chung with marijuana in

2003 and [Chung] also assisted Webber with handling the finances, keeping records of the marijuana proceeds and amounts of money paid. Intercepted conversations confirmed that Webber directed Chung on matters relating to the collection and payment of money.

The recorded conversations were all in Jamaican *patois*, [footnote: "*Patois*-a) a dialect other than the standard or literary dialect. b) uneducated or provincial speech. [Merriam-Webster Online Dictionary].] which Webber claims is impossible for non-Jamaican speaking listeners to understand. The FBI used an agent to listen to and transcribe the conversations. The recordings were heard by the jury, and the transcripts were also admitted into evidence. Webber claims the government did not ask the court to find the agent qualified as an expert witness, but that the jury was later instructed that the agent had testified as an expert. The government alleges that intercepted conversations between Webber, Hines, and Chung relating to the distribution of marijuana were coded, requiring the expertise of a drug investigator familiar with the investigation or case to interpret the codes used by the participants.

. . . .

On February 2, 2004, Special Agent Todd DeKatech of the FBI requested assistance from the Drug Enforcement Administration ("DEA") in Tucson, Arizona, to conduct surveillance on Hines, who was traveling from Cleveland to Arizona. Deputy Sheriff Karen Couture of the Pima County Sheriff's Office, assigned to the Arizona DEA Task Force, along with other agents, conducted surveillance on Hines. Hines was followed from the airport to a residence located at 8550 South Snyder Road, Tucson, Arizona.

Deputy Sheriff Couture was assigned on April 16, 2004 to serve an arrest warrant issued by the United States District Court for the Northern District of Ohio on Webber at the Snyder Road property in Tucson. Several officers, including FBI agents, went to the property to execute the arrest warrant. The property, a five-to-seven acre compound, contained a main residence (2,500 to 3,000 square feet), a smaller residence (1,100 to 1,200 square feet), a large workshop with a carport, and a swimming pool. After they arrived on the property to execute the arrest warrant, the officers were told that Webber was inside one of the houses. The officers knocked on the door and asked Webber to come outside of the smaller residence. Webber was arrested as he came out of the smaller residence at the Snyder Road property. Four other individuals were in the smaller residence. The agents went into the smaller residence to secure the property and to perform a prospective search. Deputy Sheriff Couture thereafter obtained a search warrant for all the buildings and vehicles at the Snyder Road property based on what she observed from the outside

of the building and what she was told by the FBI agents after the agents performed the prospective search and exited the smaller residence.

The search of the residences and other buildings revealed that the property was being used to pack and store marijuana. A closet located in the den of the main residence contained seven boxes containing bales of marijuana, packed in boxes with styrofoam and wrapped in plastic. Four fully loaded handguns, including two semiautomatic pistols from the smaller residence, and a zip lock bag full of marijuana were seized. In the garage were numerous boxes, marijuana seeds and residue on the ground, plastic wrapping paper, spent rolls of plastic tape, a trash bag full of unopened tape and duct tape. A 2000 Mercedes-Benz with Florida license plates and a second vehicle with Ohio plates were parked in the carport.

*United States v. Webber* (*Webber I*), 259 F. App'x 796, 797-99 (6th Cir2008).

B.

Webber, along with seven co-defendants including Chung, Hines, and Jones, was indicted by a grand jury on April 14, 2004, on twenty-five counts. Of those twenty-five counts, Webber was charged with one count of possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A), and two counts of using a telephone to commit a felony in violation of 21 U.S.C. § 843(b).[1] On August 4, 2005, a grand jury returned a superseding indictment that made all the same charges, but also alleged that Webber was subject to a sentencing enhancement if found guilty because he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 2B1.1(a). Jones, Hines, and Chung all entered into plea agreements and received sentences of between 21 months and 70 months of custody. In

---

[1]The indictment also charged Webber with possession and distribution of cocaine, but the Government later dropped that charge.

their pleas, Jones and Hines both accepted responsibility for possession of 400-700 kilograms (approximately 882-1543 pounds) of marijuana.[2]

On November 12, 2004, a jury found Webber guilty of possession with intent to distribute marijuana, and two counts of using a telephone to commit a felony. The jury found that between 1,000 and 3,000 kilograms of marijuana was attributable to Webber, and that he was an organizer or leader of a criminal activity involving five or more persons. With the assistance of a Presentencing Investigation Report ("PSR"), the district court determined that Webber's Total Offense Level was 35 and he had a Criminal History of III, providing a suggested sentencing range of 210 to 262 months, a fine of $25,000 to $8,000,000, and a Supervised Release period of up to 5 years under the U.S. Sentencing Guidelines.[3] On February 17, 2005, the district court sentenced Webber to 151 months on Count 1, and 48 months on Counts 14 and 22 to run concurrently, as well as 5 years supervised release, and a special assessment of $300. The trial court denied Webber's motion for a new trial and judgment of acquittal on December 1, 2004. Webber timely appealed arguing, *inter alia*, that the evidence was insufficient to find 2,200 pounds[4] of marijuana attributable to him.

---

[2]The record does not reflect whether Chung's plea agreement included accepting responsibility for a specific amount of marijuana.

[3]The PSR had suggested an offense level of 38, but the district court declined to apply a two-level enhancement for firearm possession and applied only a three-level, instead of the suggested four-level, enhancement for Webber's leadership position.

[4]2,200 pounds is approximately 998 kilograms.

C.

On January 9, 2008, a unanimous panel of this Court affirmed in part and reversed in part, and remanded for resentencing. This Court reversed as to the amount of marijuana that could be attributed to Webber, finding that, based on the record evidence of the quantities of marijuana and the drug proceeds, no reasonable trier of fact could find that Webber was accountable for 1,000 kilograms of marijuana. This Court's analysis on that point proceeded as follows:

> The jury determined that Webber possessed over 1,000 kilograms of marijuana. Webber argues that the quantity of drugs found by the jury could only have been based upon the testimony of Jones and Chung. Based on the testimony of Jones and Chung, Webber claims that the largest amount of marijuana that could be attributed to him is 1,810 pounds and that the government is required to prove Webber possessed about 2,200 pounds to meet the 1,000 kilograms found by the jury. [Footnote: "1 lb./ 2.2 = 1 kg."] The government argues that if the drug proceeds are taken into account, along with poundage testified to by Jones and Chung, the monetary amounts support the jury's determination that Webber possessed 1,000 kilograms of marijuana.
>
> . . . [T]he standard of review for insufficient evidence claims is whether, after viewing the facts in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
>
> The testimony at trial established that 210 pounds of marijuana was seized at the Arizona residence. [Footnote: "Neither party disputes that 210 pounds of marijuana was seized at the Arizona residence."] Jones testified that during the time he dealt with Hines, he purchased as much as 1,300 pounds of marijuana. Chung testified that the initial amount of marijuana that he received from Webber was 100 pounds. Chung also testified that he picked up a shipment for Webber of 50 pounds on one occasion, and gave a supplier of Webber $27,000.00 on another occasion. Chung testified that he counted money from Hines on two occasions at $29,000.00 and $42,000.00 respectively. Chung testified to a ledger that he maintained which indicated a total of $153,500.00 in marijuana proceeds representing money Webber told Chung to keep and money from Hines. Chung testified that when he purchased marijuana from Webber, he paid approximately about $1,100.00 to $1,200.00 per pound. Finally, in 2003, Chung testified that he purchased 150 pounds from Webber.

Adding the pounds of marijuana established at trial, the total is 1,810 pounds (210 + 1,300 + 100 + 50 + 150) or 822.73 kilograms of marijuana. The total dollar amount, without the ledger amount, equals $98,000.00 ($27,000.00 + $29,000.00 + $42,000.00). Adding the ledger amount referenced by Chung's testimony of $153,500.00, the total dollar amount gleaned from the trial is $251,500.00.

The government's brief . . . argues that account should also be taken of an additional amount of "a balance of $175,000 carried forward...." However, that amount does not appear anywhere in the cited material, nor any other place that we could ascertain from the record. The brief also claims that "conversations intercepted ... mentioned amounts of drug proceeds, possessed or to be collected for a total of $281,000." However, the government does not indicate how that figure is derived, and our own inspection of the material cited for this amount can substantiate, being extremely charitable, no more than $82,000.00.

The largest dollar amount that any rational juror could arrive at is the $251,500.00 from the previous paragraph, plus $82,000.00. Even if we take the lowest value of marijuana, $1,150.00 per pound, we arrive at an equivalent of 290 pounds of marijuana which, added to the 1,810 pounds of physical marijuana discussed above, amounts to 2,100 pounds, still falling short of the necessary 2,200 pounds required to support [a] finding [of] 1,000 kilograms. Viewing the evidence in the light most favorable to the government, there was insufficient evidence for the jury to find that Webber was involved in a conspiracy to possess with the intent to distribute more than 1,000 kilograms of marijuana.

*Webber I*, 259 F. App'x at 803-04 (internal citations omitted). This Court remanded for "further proceedings consistent with [the] opinion." *Id.* at 807.

## D.

The district court held a resentencing hearing on September 12, 2008. At the resentencing hearing, Hines testified on Webber's behalf. Although Hines had pled guilty to receiving between 400 and 700 kilos of marijuana from Webber and others, he testified at the resentencing that only between 50 to 100 pounds of that amount came from Webber through Webber's half-brother, Chung. The district court also heard argument from both Webber's attorney and the Government regarding

how much marijuana it should attribute to Webber. Responding to Webber's argument that the court

should find that only 68.04 kilograms of marijuana were attributable to Webber, premised in part on

Hines's testimony, the court stated:

> Part of the problem, Mr. Robey[5], with your analysis and your argument is
> that you are asking this Court to now reject the testimony at trial that the jury found
> to be credible by proof beyond a reasonable doubt. And you're asking me to credit
> testimony now from Mr. Hines that is inconsistent with his plea agreement, that is
> inconsistent with the testimony of Mr. Webber's brother, and that is inconsistent with
> the testimony of Mr. Jones, and is also inconsistent with a number of tape recordings
> that the government submitted at trial.

> As I read the Sixth Circuit's decision, the Sixth Circuit simply did the math
> and concluded that even if you credit all testimony presented at trial and you add all
> of the appropriate calculations, what you come up with is 2,100 pounds. The Sixth
> Circuit didn't say that there was no evidence, or even insufficient evidence to
> conclude that there was that quantity of drugs by proof beyond a reasonable doubt.
> All the Sixth Circuit said is that there was no evidence to go beyond the 2100
> pounds.

> . . . .

> Even if I were to, Mr. Robey, assume that some portion of the testimony was
> overstated as it relates to the amount of drugs that Mr. Hines obtained from Mr.
> Webber, I would have to go dramatically below the 2100 pounds that the Sixth
> Circuit felt the evidence justified before I would ever get below a total adjusted
> offense level of 30. In other words, even if I subtracted, you know, 500 pounds from
> the total, which would be very dramatic in light of all the testimony at trial, I'm still
> at the total adjusted offense level of 30 that the government believes is appropriate
> in this matter.

> So ultimately the Court's conclusion that the 2100 pounds that the Sixth
> Circuit found was supportable on the evidence submitted at trial is itself a fair
> number by a preponderance of the evidence given all the evidence that was submitted
> at trial, including the testimony of Mr. Chung regarding the purchases and the
> detailed ledger that he kept on behalf of Mr. Webber. Alternatively, the Court finds
> that at minimum that 1800 pounds is fairly established by the evidence at trial.

---

[5]Gregory Robey is Webber's attorney.

And the Court notes, as I said, that even if it credits some aspect of Mr. Hines's testimony, and conclude[s] that is a dramatic reduction in terms of poundage, and that number would be justified, meaning even several pounds less, the Court finds that we would still be in the same range at this level 30. So the Court's conclusion that the quantity of marijuana chargeable to this defendant is at least 1800 pounds and more likely that 2100 pounds that the Sixth Circuit arrived at in its detailed calculations in their opinion in this case.

The district court then found that Webber's offense level was 33[6], and he had a criminal history of III, providing for a 168- to 210-month suggested custody range under the Guidelines. However, the district court held that a downward departure was justified, and imposed a 125-month sentence.[7]

## II.

This Court reviews a district court's factual finding of a drug quantity for purposes of sentencing for clear error. *United States v. Darwich*, 337 F.3d 645, 663 (6th Cir. 2003). "A finding of fact will only be clearly erroneous when, although there may be some evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* at 663 (internal quotations omitted) (quoting *United States v. Latouf*, 132 F.3d 320, 331 (6th Cir. 1997)). Further, "[i]f the district court interprets the evidence in a manner consistent with the record, we are required to uphold its decision even if we would have

---

[6]Comprised of a base offense level of 30 based on the possession of between 700 and 1,000 kilograms of marijuana and a three-point enhancement for Webber's leadership capacity.

[7]The 125-month term was on the possession charges; the court imposed a 48-month concurrent sentence on the other counts.

reached the opposite conclusion." *Id.* (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985)).

A.

In *Webber I*, this Court reviewed the record to determine whether there was sufficient evidence that 2,200 pounds of marijuana could be attributed to Webber. In conducting the sufficiency of the evidence review, this Court appropriately viewed the evidence in the light most favorable to the Government. *United States v. Sykes*, 292 F.3d 495, 498-99 (6th Cir. 2002) (This Court's review for a claim of insufficient evidence is whether, after viewing the facts in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.). Under that standard of review, this Court found that the record supported a maximum finding of 2,100 pounds of marijuana attributable to Webber, consisting of 1,810 pounds of marijuana exchanged, and 290 pounds of marijuana calculated from the record evidence of the dollar amounts exchanged. It therefore remanded for resentencing.

On remand for resentencing, the district court noted that Hines's testimony at the resentencing hearing[8] that he received only 50 to 100 pounds of marijuana from Webber was in tension with other evidence, but ultimately never decided to what extent to credit Hines's testimony, suggesting that, to the extent the court was inclined to do so, it would not affect the sentence because even if the court made a drastic reduction, the adjusted offense level would remain the same.

---

[8]Hines did not testify at trial.

The district court recognized that the 2,100 pounds amount that this Court arrived at was based on "credit[ing] all testimony presented at trial" and then held that "the 2100 pounds that the Sixth Circuit found was supportable on the evidence submitted at trial is itself a fair number by a preponderance of the evidence given all the evidence that was submitted at trial" or, in the alternative, "that 1800 pounds is fairly established by the evidence at trial."

B.

This Court has held that "[i]f the exact amount of drugs is undetermined, an estimate will suffice, but . . . a preponderance of the evidence must support the estimate." *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008) (internal quotations omitted). In *United States v. Walton*, 908 F.2d 1289 (6th Cir. 1990), we held that "[a]llowing a court to find a defendant responsible for the maximum quantity of drugs that can plausibly be found could result in defendants receiving excessive sentences based on a finding of quantity that is more likely than not excessive. Such a result would violate a defendant's due process rights." *Id.* at 1302. Therefore, in estimating drug quantities for purposes of sentencing, *Walton* advised that "when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution." *Id.* Although *Walton* was a pre-*United States v. Booker*, 543 U.S. 220 (2005) case, and therefore its analysis was premised on the mandatory application of the U.S. Sentencing Guidelines, this Court has also applied this principle post-*Booker*. In *United States v. Anderson*, 526 F.3d 319 (6th Cir. 2008), the defendant pled guilty to money laundering after being indicted on charges that included conspiracy to distribute methamphetamine and laundering money

produced by the sale of the drugs. *Id.* at 321. In order to determine the appropriate offense level at sentencing, the district court asked an officer involved in the case to determine the minimum amount of drugs the defendant could reasonably have foreseen the individual she was laundering money for was selling. *Id.* at 322. The officer provided a figure of three pounds. *Id.* at 322. When asked if that amount was a guess, the officer replied "That's correct." *Id.* at 326. The court found by a preponderance of the evidence that the figure was a conservative estimate. *Id.* at 322. On appeal, the defendant argued that the officer was merely speculating as to the amount of drugs, and that resentencing was required. *Id.* at 326. This Court found that the drug quantity determination was not clearly erroneous. *Id.* "A drug quantity need only be established by a preponderance of the evidence, and an estimate will suffice so long as it errs on the side of caution and likely underestimates the quantity of drugs actually attributable to the defendant." *Id.* This Court found that based on the evidence in the record as to the various quantities of money that had been exchanged, and the officer's conversion of that quantity of money into the equivalent amount of methamphetamine, the officer's estimate was sufficiently conservative because that estimate utilized the minimum amounts of cash supported by the record. For example, when the evidence showed that the defendant had delivered $20,000 at "times," the officer estimated that that amount had been delivered twice, as opposed to some higher plural number. *Id.* at 326; *see also United States v. Brothers*, 209 F. App'x 460, 466 (6th Cir. 2006) (applying *Walton* and holding that district court did not err in applying low end of estimated drug range)*; Darwich*, 337 F.3d at 661 (applying conservative calculation to drug quantity amount).

Thus, where evidence of drug quantities are provided in estimates and ranges, the calculations for a sufficiency-of-the-evidence challenge, which maximize the amounts, will differ from the necessary calculations for sentencing purposes, which minimize the amounts. The district court's opinion, delivered from the bench, does not, however, reveal whether it applied the principle of erring on the side of caution in determining the amount of marijuana attributable to Webber.

Additionally, the district court's analysis of the drug quantity attributable to Webber is not sufficient for our review under Fed. R. Crim. P. 32(i)(3)(B), and also requires that we again remand for resentencing. *United States v. Orlando*, 281 F.3d 586, 601 (6th Cir. 2002) (holding that, in sentencing, a district court must "refer to particular evidence or present . . . more than general conclusions"); *see also United States v. Williams*, 612 F.3d 500, 515 (6th Cir. 2010) ("literal compliance" with Rule 32(i)(3)(B) "helps to ensure that defendants are sentenced on the basis of accurate information and provides a clear record for appellate courts." (quoting *United States v. Tackett*, 113 F.3d 603, 613-14 (6th Cir. 1997)).

## C.

To be sure, it is possible to attribute more than 1543 pounds of marijuana to Webber. The low end of the range of marijuana Jones testified to receiving in the conspiracy was 1100 pounds.[9]

---

[9]We note that the low end of the range of marijuana possession that Jones pled guilty to possessing was 882 pounds. The range that Jones testified to at trial fits within the range he pled guilty to, potentially "giving the higher estimate increased probability." *Brothers*, 209 F. App'x at 466 (quoting *United States v. Taylor*, 111 F.3d 56, 59 (7th Cir. 1997)). However, the district court did not explain its reasoning, and so we are unable to know how it determined the amount attributable to Webber through Jones.

The low end of the range Chung testified to selling was 100 pounds. Chung also testified to purchasing 100 pounds from Webber, and purchasing 50 pounds for Webber and himself.[10] Assuming, arguendo, that the district court would not credit Hines's testimony at all, and thus would attribute the full 1100 pounds from Jones's testimony to Webber, that it would not apply the 882-pound amount representing the low end of Jones's plea range, but would rely on Jones's testimony regarding a greater amount, and that it would attribute 250 pounds through Chung's testimony, we arrive at a sub-total of 1560 pounds of marijuana.

In calculating the conversion of cash to marijuana, in addition to the discrete sums testified to by Chung of $29,000, $42,000, and $27,000, there is also the full ledger amount of $153,500 and the $82,000 amount credited by this Court in *Webber I*, for a total of $333,500. We note, however, that the Court stated in *Webber I* that crediting the $82,000 amount was "extremely charitable," and erring on the side of caution runs counter to such charity at sentencing.[11]

Regardless of the dollar amount used in the calculation, erring on the side of caution entails using the highest per-pound price. The highest per-pound price Hines testified he would pay Webber for marijuana was $1,250.[12] Dividing $333,500 by $1,250 produces a marijuana equivalent of

---

[10]We note that Webber's brief to this Court argues that only 100 pounds total is attributable to Chung's testimony, but without fully explaining that calculation.

[11]In this appeal, the Government has not cited us to the evidence in the record that supports the additional $82,000, as it apparently did not in *Webber I*. *Webber I*, 259 F. App'x at 804 ("[T]he government does not indicate how that figure is derived.").

[12]Chung, however, testified that he paid between $1100 and $1200 per pound, as opposed to the $1150 to $1250 testified to by Hines. Out of an abundance of caution, and because the

approximately 267 pounds, thus producing a total of 1827 pounds of marijuana attributable to Webber. Again, this figure assumes that all the dollar amounts represent conservative estimates.

Although 1827 pounds is above the minimum of 1800 pounds that the district court found was attributable to Webber, we were forced to make a number of assumptions in reaching that amount, and, as noted above, we do not know if the district court actually made these findings, and if so, what they were based on.

Just as it is possible to attribute over 1543 pounds to Webber, it is possible to arrive at a lesser figure. Although it is not disputed that police found 210 pounds of marijuana at the Arizona compound, and that in *Webber I* we found this evidence admissible as "relevant to the charge of conspiracy," *Webber I*, 259 F. App'x at 801, the record does not clearly reveal, and the district court's opinion does not explain in a manner sufficient for our review, how this 210 pounds is attributable to Webber.

If the district court were to determine that the 210 pounds of marijuana found in Arizona was not attributable to Webber, that only 100 pounds of marijuana was attributable through Chung, instead of 250, that only 882 pounds of marijuana, as opposed to 1100 pounds, should be attributed through Jones, or that the $82,000 amount should not be attributed to Webber (the equivalent of 75 pounds[13]), the amount of marijuana attributable to Webber could be reduced by up to 653 pounds,

monetary figures represent a mixture of cash from Hines and Chung, we use the highest figure out of the two.

[13]In this calculation, erring on the side of caution entails using the lowest per pound price, which was the $1100 testified to by Chung.

- 15 -

placing Webber at a 28 Offense Level.[14]  Further, the district court decided that it need not determine to what extent to credit Hines's testimony at the re-sentencing hearing[15] because "even if [the court] subtracted, you know, 500 pounds from the total . . . [the court is] still at the total adjusted offense level of 30."  However, depending on how the district court addresses the other amounts and issues discussed above, it is possible that should the district court decide to credit Hines's testimony to some extent, the reduction resulting from that could be determinative of Webber's offense level.

We therefore again remand to the district court for resentencing.  We emphasize that our calculations were performed merely to show that the amount of marijuana attributable to Webber could potentially be sufficiently lower to place Webber in a different offense level category, and not to ascribe a conclusive number to that attributable amount.  We leave it to the district court's discretion, consistent with the principles discussed above, to determine that amount.

Because we remand for resentencing on the basis of the amount of marijuana attributable to Webber, we need not reach the other sentencing claims Webber raises in this appeal.

We **REVERSE** and **REMAND** for resentencing consistent with this opinion.

---

[14]A defendant found to possess between 400 kilograms (approximately 882 pounds) and 700 kilograms (approximately 1,543 pounds) of marijuana merits a 28 offense level.  U.S.S.G. § 2D1.1(c)(6).

[15]Although the district court opined that Hines's testimony was "inconsistent" with other record evidence, it never explicitly held that Hines's testimony was unreliable.