UNITED STATES of America,
Plaintiff–Appellee,

v.

Rashad WOODSIDE, Defendant–
Appellant.

No. 15–5346.

United States Court of Appeals,
Sixth Circuit.

Feb. 10, 2016.

BEFORE: SILER, CLAY, and KETHLEDGE, Circuit Judges.

CLAY, Circuit Judge.

Defendant Rashad Woodside appeals from the sentence of the district court sentencing him to 170 months of imprisonment and three years of supervised release for conspiracy to distribute, and to possess with intent to distribute, oxycodone, hydromorphone, oxymorphone, and buprenorphine, in violation of 21 U.S.C. §§ 841(b)(1)(C) and 846. For the reasons set forth below, we **AFFIRM IN PART,** but **VACATE THE SENTENCE,** and **REMAND** for resentencing.

## BACKGROUND

### Factual Background

Tennessee resident Kenneth Stafford began trafficking prescription pain medications with his girlfriend, Kaycee Breeden, in late 2008 or early 2009. One of their sources for prescription medications, including Lortab (hydrocodone), Roxicodone (oxycodone) and Dilaudid (hydromorphone), was Frederick McGregor, who lived in Florida. McGregor paid various individuals, including Defendant, to go to doctors' offices to procure prescriptions for pain medication. After McGregor bragged to Defendant about how much pain medication he was selling to Stafford, Defendant acquired Stafford's phone number from McGregor's truck, possibly from McGregor's cell phone, and offered to sell oxycodone to Stafford at a lower price. Stafford and Breeden began buying from Defendant at some point in 2010. Stafford did not tell McGregor that he was buying pills from Defendant because he "didn't want [McGregor] to find out that [he] was doing business" with Defendant and did not want the purchases from Defendant "to end [his] relationship" with McGregor. (R. 1016, Tr. of Sentencing Hr'g 3596–97,

3642.) McGregor did not know about the pill sales until a few years later. For a time, Stafford and Breeden purchased drugs from both Defendant and McGregor, after which they stopped purchasing from McGregor but continued purchasing from Defendant.

Drug Enforcement Agency (DEA) agents intercepted communications from Defendant to Stafford and Breeden between March and June 2013. During the wiretaps, the DEA intercepted two packages from Defendant, each of which contained approximately 360 pills. Defendant was arrested by federal agents at his home in Florida on June 3, 2013. After being given his *Miranda* rights, Defendant spoke at length to a DEA agent about his participation in the prescription drug scheme.

### Procedural History

Defendant was indicted along with twenty-three others, including Stafford and Breeden but not McGregor, in the United States District Court for the Middle District of Tennessee for conspiring to possess oxycodone, hydromorphone, oxymorphone, and buprenorphine with intent to distribute. Defendant entered an open guilty plea on July 18, 2014. The Pre–Sentence Investigation Report ("PSR") subsequently prepared recommended that Defendant be held accountable for 343,000 30–milligram Roxicodone tablets containing 27 milligrams of pure oxycodone, a figure that included McGregor's estimated purchases to Stafford and Breeden. Based on the drug equivalency table contained in U.S.S.G. § 2D1.1, which equates 1 gram of actual oxycodone to 6700 grams of marijuana, the PSR recommended holding him accountable for 62,048.7 kg of marijuana, a figure corresponding to a Base

Offense Level of 36.[1] The PSR noted that even if Defendant were held accountable for half that amount, or 31,024.35 kg of marijuana, his Base Offense Level would remain 36. The PSR recommended a four-level leadership role enhancement, and a three-level reduction for acceptance of responsibility, for a final level of 37. The PSR calculated Defendant's Criminal History Category as I, and calculated a Guidelines range of 210–262 months' imprisonment, but reduced that range to 210–240 months because of the 20–year statutory maximum in 21 U.S.C. § 841(b)(1)(C). Defendant filed an objection to the PSR disputing the drug quantity calculation.

### The sentencing hearing

The district court held a lengthy sentencing hearing for Defendant on March 12, 2015. The government called three witnesses to testify: DEA agent Dave Lewis, Stafford, and Breeden, who each testified as to their estimates of the number of pills that McGregor and Defendant provided. Defendant did not testify.

### Agent Lewis' testimony

Lewis testified about Defendant's post-*Miranda* confession at the time of Defendant's arrest. He stated that Defendant had confessed to having sold hundreds of pills to Stafford and Breeden over two or two and a half years. Based on a combination of wiretaps and interviews with cooperating witnesses, Lewis estimated that he had heard of 10,000–15,000 pills during the investigation—which he called a "conservative estimate"—and extrapolated to "70–, 80–, 90, hundred thousand" if "you take into consideration the whole conspiracy." (R. 1016, Tr. of Sentencing Hr'g at Page ID 3573.) The intercepts were not always consistent as to quantity; sometimes "Mr. Stafford would say [he] received two or three thousand pills a month, and then there would be intercepts where he would ... talk to others about the fact that at one time he was getting two and three thousand pills per week." (*Id.* at Page ID 3575.) However, the number of pills decreased over time: Stafford was receiving 1,000 pills per week in 2010 and 2011, and 300–500 per week in 2012 and 2013.

Defendant told Lewis that he had a prescription in his own name for pain medication in the amount of 120–180 pills per 28 days or month. When Lewis asked about where the remainder of the pills that he had sold to Stafford and Breeden had come from, Defendant admitted that he had bought them from other patients or even "sponsored" other patients to get pain medication, whereby he paid the fee for the doctor's visit and/or the prescription in exchange for a large portion of the medicine. Defendant also admitted to paying his girlfriend's brother, Demetrice Armstrong, $200 at a time to receive money via Western Union and packages with payments for the drugs.

### Stafford's testimony

Stafford then testified for the government. Before addressing drug quantities, he admitted that he had abused oxycodone, Xanax, hydrocodone, and Lortab, and that Xanax could affect his short-term memory on the day after use. Stafford testified that he had begun selling prescription pills in late 2008 or early 2009.

Stafford testified that when he first started selling prescription drugs, he was buying 1,000 pills per week from McGregor, roughly 70% of which were oxycodone

---

1. Each 30–milligram tablet containing 27 mg of actual oxycodone is therefore equivalent to .1809 kg of marijuana.

and 30% of which were Lortabs. About six months later, he began buying pills from Defendant. Stafford testified that initially he purchased 400–500 pills per week from Defendant, with approximately the same 70/30 ratio of oxycodone to Lortab. For about eighteen months, Stafford received approximately 1,000 pills per week from both Defendant and McGregor. Around late 2011 or early 2012 he stopped buying from McGregor. Thereafter, Stafford continued purchasing 1,000 pills per week from Defendant, but by the last six to eight months of the conspiracy, Stafford received only 300–600 pills, about 70% of which were oxycodone. Stafford acknowledged an intercepted communication in which he stated, "I used to get 2,000—two, three thousand a week, man. And that's like I had my two connects," meaning both McGregor and Defendant. (*Id.* at Page ID 3611.)

Stafford testified that when he sent packages of money to pay Defendant for pills, Defendant directed him to send the packages to three or four other people whose names Stafford could not recall. When asked whether he had spoken with Defendant about how Defendant procured the pills, Stafford testified that Defendant had told him that "he had various people that he would go pick up, take to the doctor, wait on to get out, and take them to the pharmacy, get them filled, stuff like that. He would do that every day." (*Id.* at Page ID 3602.) Stafford then clarified: "he told me it was like a full-time job.... he would do that every day." (*Id.*)

**Breeden's testimony**

Breeden testified that she used "Lortab, Roxicodone, Opanas, Dilaudid, crack, methamphetamine, [and] cocaine" in the months leading up to her arrest. (*Id.* at Page ID 3635.) She estimated that McGregor supplied about 1,000 Roxicodone pills per week or 4,500 Roxicodone pills per month. On direct examination, Breeden stated that she and Stafford purchased pills from McGregor for "at least six months" or longer prior to purchasing from Defendant.[2] (*Id.* at Page ID 3640.) On cross-examination, she testified that she and Stafford began purchasing pills from Defendant in 2010. (*Id.* at Page ID 3655.) After Breeden and Stafford began purchasing from Defendant, they received approximately 1,500 pills per week or 6,000 pills per month between McGregor and Defendant, which was "mostly just Roxicodone." (*Id.* at Page ID 3643–44.) Without prompting from counsel, Breeden speculated that the two suppliers were in competition; "the less Mr. McGregor was able to send ... the more Mr. Woodside was able to send." (*Id.* at Page ID 3643.) Breeden recalled that she and Stafford purchased pills from both McGregor and Defendant for approximately six months. Like Stafford, she testified that they stopped purchasing from McGregor at some point; after that, she testified, Defendant was initially "able to send more, but then over time the numbers decreased." (*Id.* at Page ID 3647.) She estimated receiving approximately 500 pills per week in the last six months before she got arrested, although there were some weeks when she and Stafford did not receive packages.

She also testified that she and Stafford mostly addressed packages containing

---

**2.** On cross-examination, Breeden was asked how long she and Stafford purchased pills from McGregor and then how long she purchased pills from McGregor prior to purchasing from Defendant. In response to both questions, she responded that it was about a year and a half; however, her response to the second question suggests that she may have been restating the total duration of the purchases from McGregor. (*Id.* at Page ID 3662.)

drug proceeds to Defendant, but also addressed them to two or three other people, at Defendant's direction, to addresses that Defendant would specify. She also stated that she had spoken to Defendant once about sending people to the doctor and paying for their prescriptions.

### Drug calculations

The government requested that the district court credit Stafford's testimony, which, by the government attorney's calculations, equaled the equivalent of 31,727 kilograms of marijuana, a figure corresponding to a base level of 36. The government then undertook a rough oral calculation of Breeden's estimates, which it calculated as "around 28– or 29,000" kilograms of marijuana.[3] (*Id.* at Page ID 3669.) Defendant argued that the district court should instead extrapolate from the pill quantities contained in the seized packages, which it requested the government average over the seven-month course of the investigation and then extrapolate over two years, for 1,224 oxycodone and 1,080 hydromorphone pills, numbers Defendant claimed corresponded to a base level of 24.

After agreeing with the government that a four-level leadership enhancement was appropriate, the district court proceeded to a drug quantity calculation of its own:

> The numbers do jump around, and I'm sure as I'm listening to the testimony, you'll probably notice me up here with my calculator. And I keep going back and forth in doing these calculations because it does keep moving. And I got some of the testimony up as high as over 36,000 grams [sic] based on what you were going to believe. And I'd get 36,-000 and I'm going, oh, wait a minute, now somebody has moved off of that a little bit. It stayed over 30, although Ms. Breeden does come under a little bit when she gets to 28.
>
> ... A big chunk of it is based on the memory of people who were drug addicts at the time. But it's also supported by the objective data of the agents, and their testimony is internally consistent with each other. They may be off on some details, which when you extrapolate this out, tends to make thousands of grams [sic] worth of marijuana equivalent difference, but the details or the—most of the details are completely consistent, and then they break a little bit.
>
> I am going to do this because there are numbers, and I calculated them differently. The two calculations come off different depending on whether you're going with a straight Stafford or a straight Breeden or Agent Lewis. A conservative estimate is still 28. It puts them under 30, takes them down to a 34. I think a 34 base.

(*Id.* at Page ID 3679–80.) The district court clarified that it was talking about thousands of kilograms of marijuana equivalent. The district court then added:

> But most of it was over 30. I'm going to give him the benefit of the doubt, and I'll go with Ms. Breeden, even though at times her testimony was not as clear as Mr. Stafford's. I think he most of the time had a better memory, but I'll give Mr. Woodside a break and go with her number. Puts him at a base level of 34 then.

---

**3.** This calculation was based on the following statement by the government: "I think at the very end she said that they were getting approximately 6,000 a month for about a year and a half. That's around, again, around a hundred thousand pills." (*Id.* at Page ID 3669.) Breeden never actually said this. She testified that she recalled purchasing a total of 6,000 pills per month from both Defendant and McGregor "[f]or about maybe *six* months." (*Id.* at Page ID 3644) (emphasis added).

(*Id.* at Page ID 3681.) The district then deducted three levels for acceptance of responsibility, for a final level of 35. After calculating a Guidelines range of 168–210 months, the district court sentenced Defendant to 170 months' imprisonment, followed by three years of supervised release.

## DISCUSSION

### Standard of review

We review sentences for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). We must "first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.* The determination of a drug quantity by a district court is a factual finding, which we review for clear error. *United States v. Olsen*, 537 F.3d 660, 663 (6th Cir.2008). "A factual finding is clearly erroneous when a court, on reviewing the evidence, 'is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir.2009) (quoting *United States v. Navarro–Camacho*, 186 F.3d 701, 705 (6th Cir.1999)). We apply deferential review to the district court's legal conclusion that a defendant is an organizer or leader pursuant to U.S.S.G. § 3B1.1(a). *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013) (affirming district court's finding that enhancement applied where district court's analysis was not unreasonable). Unpreserved procedural errors are reviewed for plain error only. *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir.2008).

### Analysis

### I. Drug quantity calculations

Defendant makes three arguments in support of his contention that the district court incorrectly and improperly calculated the drug quantity for which he was responsible: the district court inappropriately based its calculation on the testimony of former drug users with impaired memory; made inadequate findings of fact on the record; and attributed to him drug trafficking beyond the scope of his jointly undertaken criminal activity.

■ Defendant first objects to the district court's reliance on the testimony of Stafford and Breeden, who used prescription pain medication at the time of the transactions in question. This Court "afford[s] the district court's credibility determinations regarding witness testimony great deference." *United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir.2007). The district court acknowledged that its calculations were "based on the memory of people who were drug addicts at the time." (Tr. of Sentencing Hr'g, R. 1016, at Page ID 3680.) However, the court below credited their testimony because the drug quantity estimates were "also supported by the objective data of the agents, and their testimony is internally consistent with each other." (*Id.*) The record indeed shows Stafford and Breeden corroborated each other's testimony in many respects, which was in turn corroborated by the agents. It was therefore not improper for the district court to have relied Stafford and Breeden's estimates of drug quantities.

■ Defendant next argues that his sentence must be vacated and remanded because the district court failed to make sufficient findings of fact on the record regarding drug quantity and to explain its calculations adequately. Defendant ar-

gues that the district court should have articulated what quantities of drugs it attributed for which time periods of the conspiracy because a district court "must determine a weekly [drug] quantity and then select a time period over which it is more likely than not that [a defendant was] dealing in that quantity." *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir.1990). Without some numeric basis stated by the district court on 'the record, Defendant asserts, this Court cannot assess whether the district court actually found Defendant to have been responsible for the 28,000 kilograms on the basis of "reliable information and supported by a preponderance of the evidence," or simply invented its numbers. *See United States v. Meacham*, 27 F.3d 214, 216 (6th Cir.1994). The government counters that the district court described its findings appropriately and proceeded to apply the most conservative of its estimates.

District courts may approximate drug quantities, but "a preponderance of the evidence must support the estimate." *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir.2008) (quoting *Walton*, 908 F.2d at 1302). Any estimate "must have a minimal level of reliability beyond mere allegation, and the court should err on the side of caution in making its estimate." *United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir.2004) (quoting *United States v. Owusu*, 199 F.3d 329, 338 (6th Cir.2000)). Although the district court stated that it used a calculator in arriving at its calculation of 28,000 kilograms of marijuana, it never explained how it turned Breeden's testimony into a final figure. We are mindful that district courts sometimes struggle to calculate drug quantities in complex cases. *See Walton*, 908 F.2d at 1302. However, in such cases where evidence is controverted, calculations are complicated, and appeals are likely to follow, it is especially important to create a clear record to facilitate appellate review. The calculation at issue here involved especially many moving parts: the chronology of when Defendant began selling to Stafford and Breeden and when Stafford and Breeden stopped purchasing from McGregor; how many pills Defendant provided while McGregor was also providing pills; the number of pills sold at the end of the conspiracy; the dosage of the pills; the proportion of oxycodone to other drugs; and the equivalent weight in marijuana, among others. While we are sympathetic to the district court's frustration, the absence in the record of the numbers the district court used renders its methodology totally opaque, and compels us to ` vacate Defendant's sentence and remand for a better explanation of the district court's calculation, or for recalculation of the quantity of drugs for which Defendant is to be held accountable. *United States v. Webber*, 396 Fed.Appx. 271, 279 (6th Cir. 2010) (holding that remand was required where "the district court's analysis of the drug quantity attributable" to the defendant was "not sufficient" for appellate review).

Defendant argues that the district court should not have counted the drugs McGregor sold to Stafford and Breeden towards the total amount of oxycodone for which he was sentenced. Defendant did not make this argument at sentencing. The district court did not explicitly state whether Defendant was to be held accountable for any of the pills provided by McGregor, although the relatively small difference between the 28,000–kilogram figure and the 31,727–kilogram estimate based on Stafford's testimony that included McGregor's pills suggests that it may have.

The United States Sentencing Guidelines allow a criminal defendant to be held responsible for "all acts and omissions of others that were within the scope of the jointly undertaken criminal activity in fur-

therance of that criminal activity, and reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Defendant argues that the district court erred because the pills McGregor supplied without his involvement were outside the scope of the jointly undertaken activity. For its part, the government considers *all* drug trafficking by both Defendant and McGregor to have been jointly undertaken and reasonably foreseeable.

The commentary to the Guidelines states that

> the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), *the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake* (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement) ... Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B).

U.S.S.G. § 1B1.3, cmt. n. 3(B) (emphasis added). The comment further counsels:

> In cases involving contraband (including controlled substances), the scope of the jointly undertaken criminal activity (and thus the accountability of the defendant for the contraband that was the object of that jointly undertaken activity) may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities.

*Id.*

A district court must therefore "make *particularized* findings with respect to

both the scope of the defendant's agreement *and* the foreseeability of his co-conspirators' conduct before holding the defendant accountable for the scope of the entire conspiracy." *United States v. Campbell,* 279 F.3d 392, 400 (6th Cir.2002). In *Campbell,* this Court found the attribution of a the entire amount of cocaine involved in a multi-defendant drug ring to a single defendant clearly erroneous where the record did not show that district court had made findings as to the scope of that defendant's agreement to undertake joint criminal activity. *Id.* The "mere fact" that the defendant "was aware of the scope of the overall operation [was] not enough to hold him accountable for the activities of the whole operation." *Id.* at 401. Accordingly, the court vacated the sentence and remanded for further proceedings. *Id.* On remand, the district court should make these findings of fact in the first instance. *See also United States v. Jenkins,* 4 F.3d 1338, 1347 (6th Cir.1993) (remanding "to give the district court an opportunity to address the criteria of U.S.S.G. § 1B1.3 and determine the scope of the criminal activity [the defendant] agreed to undertake").

## II. Leadership Role Enhancement

Defendant also argues that the district court erred in applying a four-level enhancement for a leadership role. U.S.S.G. § 3B1.1(a) allows a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The commentary to this section of the Guidelines lists factors for a court to consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruit-

ment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. n. 4. We also require control over at least one other individual within a criminal organization to merit an enhancement under U.S.S.G. § 3B1.1(a). *United States v. Walls,* 546 F.3d 728, 735 (6th Cir.2008) (quoting *United States v. Vandeberg,* 201 F.3d 805, 811 (6th Cir.2000)). Defendant argues that the government did not meet its burden of showing the requisite number of participants in the conspiracy and Defendant's alleged control over other individuals' actions because none of the sponsored patients testified.

■ However, the district court reasonably found that Defendant recruited his girlfriend's brother and the unnamed individuals whom he sponsored. Agent Lewis testified that Defendant directed his girlfriend's brother, Demetrice Armstrong, to receive money via Western Union and pick up packages, and that Defendant paid Armstrong for his service. Breeden testified that she and Stafford addressed packages of money to two or three other people besides Defendant; Stafford testified that it was three or four. Stafford related a conversation in which Defendant apparently complained about driving patients to the doctor and to the pharmacy on a daily basis, which Defendant compared to a "full-time job." (Tr. of Sentencing Hr'g, R. 1016 at Page ID 3602.) Because all three witnesses always spoke of the sponsored patients in the plural, and Stafford and Breeden testified to sending the packages to between two and four other recipients, it was not unreasonable for the district court to have conclud-

ed that the conspiracy involved five or more people. Moreover, the government met its burden of showing control of one other individual through Lewis' testimony about Defendant's directing Armstrong to receive money transfers and packages of funds—and paying him for his efforts. Therefore, the district court did not improperly apply a four-level enhancement for a leadership role.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the application of the leadership role enhancement, but **VACATE** Defendant's sentence, and **REMAND** to the district court for a recalculation of the drug quantity attributable to Defendant.