RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0146p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 17-5125

RASHAD WOODSIDE,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:13-cr-00097-3—Kevin H. Sharp, District Judge.

Argued: March 8, 2018

Decided and Filed: July 18, 2018

Before: GILMAN, ROGERS, and STRANCH, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Dustin M. Blake, BLAKE LAW FIRM CO., LLC, Columbus, Ohio, for Appellant.
Ahmed A. Safeeullah, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for
Appellee. **ON BRIEF:** Dustin M. Blake, BLAKE LAW FIRM CO., LLC, Columbus, Ohio, for
Appellant. Brent A. Hannafan, UNITED STATES ATTORNEY'S OFFICE, Nashville,
Tennessee, for Appellee.

ROGERS, J., delivered the opinion of the court in which GILMAN and STRANCH, JJ.,
joined. STRANCH, J. (pp. 12–13), delivered a separate concurring opinion.

---

**OPINION**

---

ROGERS, Circuit Judge. Rashad Woodside, a Florida resident, participated in a 24-person conspiracy to distribute pain pills in Middle Tennessee. After pleading guilty, Woodside appealed his sentence, which we vacated so that the district court might better explain the quantity of drugs attributable to him. On remand the district court, without further hearing, imposed the same sentence and explained its reasoning—including the drug quantity on which it based Woodside's sentence—in a written amended judgment. Woodside again appeals, arguing that the district court erred by not affording him a new sentencing hearing, and moreover violated 18 U.S.C. § 3553(c) by not stating the new explanation for his sentence "in open court." These and other procedural arguments do not warrant reversal.

Woodside supplied two of his co-defendants, Kenneth Stafford and Angela Breeden, with prescription pills, which Woodside would ship from Florida to Tennessee. Early in the conspiracy, Fredrick McGregor was a key part of the enterprise. At that time, the scheme worked like this: Woodside and others would go to a doctor and obtain prescription pills for McGregor, who would then sell them to Stafford and Breeden. Woodside eventually decided to go into business for himself and contacted Stafford with an offer to undercut McGregor. For around eighteen months, Stafford and Breeden continued to purchase from both men, but eventually Stafford and McGregor had a falling out, at which point—around "[l]ate 2011, early 2012," according to Stafford—Woodside became the sole supplier of Stafford and Breeden.

The conspiracy's dealings eventually attracted the attention of the Drug Enforcement Administration (DEA). Based on information obtained through wiretapped phone conversations and seizures of shipped drugs, a grand jury returned a single-count indictment charging Woodside and 23 codefendants—including Stafford and Breeden—with conspiracy to possess with intent to distribute oxycodone and other prescription medications, in violation of 21 U.S.C. §§ 841 and 846. Woodside pleaded guilty.

The Probation Office prepared a Presentence Report (PSR), which recommended holding Woodside responsible for 343,000 30-milligram oxycodone pills,[1] each containing 27 milligrams of actual oxycodone. That figure included the drugs that McGregor had sold to Stafford and Breeden. Based on the drug-equivalency table in the United States Sentencing Guidelines, which equates 1 gram of actual oxycodone to 6,700 grams of marijuana, the report recommended holding Woodside accountable for approximately 62,000 kilograms of marijuana equivalent, for a base-offense level of 36. Woodside objected to that drug-quantity calculation.

At Woodside's sentencing hearing, the government put on three witnesses: DEA Agent David Lewis, Stafford, and Breeden. Each testified about the number of pills attributable to Woodside. Agent Lewis testified that "10- to 15,000 pills" was a "conservative estimate" of the pills Woodside sold "[d]uring the six-month period leading up to [his] arrest." Agent Lewis estimated that Woodside sold "closer to 70-, 80-, 90-, hundred thousand" pills throughout the course of the "whole conspiracy." Stafford testified that at first he bought about 1,000 pills per week from McGregor, that he initially bought 400 to 500 pills a week from Woodside, and that he eventually received about 1,000 pills per week from each of Woodside and McGregor, an arrangement that continued for about 18 months. Stafford further testified that he stopped buying from McGregor in late 2011 or early 2012, but continued to purchase about 1,000 pills per week from Woodside, which he continued to do until the last eight months of the conspiracy, during which he received only 300 to 600 pills per week. Stafford also acknowledged an intercepted conversation in which he said, "I used to get 2,000—two, three thousand a week, man. And that's like I had my two connects," referring to Woodside and McGregor. Finally, Breeden testified that McGregor supplied about 1,000 oxycodone pills per week, that she and Stafford purchased from McGregor for "at least six months" or longer before beginning to purchase from Woodside, and that once they began purchasing from both, which they did for about six months, they would receive about 1,500 pills per week. Breeden testified that after they stopped purchasing from McGregor, Woodside initially was "able to send more, but then

---

[1]The record sometimes refers to these 30-milligram oxycodone pills by the name brand "Roxicodone." For the sake of consistency we use the generic term "oxycodone pill" to refer to the 30-milligram pills, each containing 27 milligrams of actual oxycodone, on which Woodside's sentence was based.

over time the numbers decreased," to the point where they were receiving about 500 pills per week during the last six months before Breeden was arrested.

After hearing that testimony, the district court found that Woodside was responsible for 28,000 kilograms of marijuana equivalent, for a base-offense level of 34, assigned by the guidelines to those responsible for 10,000 to 30,000 kilograms of marijuana equivalent. According to the PSR, each 30-milligram oxycodone pill contains 27 milligrams of actual oxycodone. According to the guidelines, each gram of actual oxycodone is equivalent to 6.7 kilograms of marijuana for sentencing purposes. *See* USSG § 2D1.1 comment. (n.8). Thus, each 30-milligram oxycodone pill is equivalent to .1809 kilograms of marijuana. The district court's estimate of 28,000 kilograms of marijuana equivalent, then, corresponded to roughly 154,781 oxycodone pills.

The transcript did not make clear exactly how the district court calculated the 28,000-kilogram quantity, but the court discussed the testimony of both Stafford and Breeden before apparently relying primarily on Breeden's testimony to estimate the quantity of drugs attributable to Woodside. The district court imposed a four-level enhancement for Woodside's being a leader or organizer of the conspiracy and deducted three levels for his accepting responsibility, resulting in a final offense level of 35. After calculating a guidelines range of 168 to 210 months of imprisonment, the district court sentenced Woodside to 170 months' imprisonment, followed by three years of supervised release.

Woodside appealed his sentence, arguing that the district court's factfinding with respect to the drug quantity attributable to him was inadequate. We agreed and vacated Woodside's sentence, explaining:

> [T]he absence in the record of the numbers the district court used renders its methodology totally opaque, and compels us to vacate Defendant's sentence and remand for a better explanation of the district court's calculation, or for recalculation of the quantity of drugs for which Defendant is to be held accountable.

*United States v. Woodside*, 642 F. App'x 490, 496 (6th Cir. 2016). We also noted that the district court did not make clear whether it held Woodside responsible for the drugs sold by McGregor, so we instructed the district court to "make . . . findings of fact in the first instance"

regarding both the scope of Woodside's agreement with McGregor and the foreseeability of McGregor's conduct before holding Woodside responsible for drugs sold by McGregor. *Id.* at 497. We thus remanded Woodside's case to the district court "for a recalculation of the drug quantity attributable to [him]." *Id.* at 498.

On remand, the district court estimated that Woodside was responsible for 28,568 kilograms of marijuana equivalent. After recounting witness testimony from the prior sentencing hearing, the district court made findings of fact and explained its drug-quantity calculation as our remand asked. This time around, the court relied primarily on Stafford's testimony to establish drug quantity. After reapplying the four-level leader-or-organizer enhancement and the three-level acceptance-of-responsibility reduction, the district court found that Woodside's final offense level remained at 35, which resulted in the same guidelines range. The court thus reaffirmed its prior judgment and imposed the same 170-month sentence.

Woodside again appeals, and now presses four arguments. He argues that the district court (1) was required by our remand to grant Woodside a new sentencing hearing, and (2) was required by 18 U.S.C. § 3553(c) to state the reasons for his sentence in open court. He also argues that his sentence was procedurally unreasonable because the district court (3) erroneously attributed to him drugs sold by McGregor, and (4) failed to "err on the side of caution" when choosing which of Woodside's coconspirators' testimony to credit as establishing drug quantity. Ultimately none of Woodside's arguments is persuasive.

First, the district court did not commit any procedural error when it denied Woodside's request for a new sentencing hearing and resentenced him through a written amended judgment. Our prior panel had issued a limited remand, the language of which did not entitle Woodside to a new sentencing hearing, and in accordance with that remand, the district court imposed the same sentence based on the same record.

Our remand in Woodside's prior appeal was a limited one. Woodside argues that the remand was general, and that accordingly, under *United States v. Garcia-Robles*, 640 F.3d 159, 166 (6th Cir. 2011), it required an unlimited resentencing procedure. It is true that a remand is presumptively general as opposed to limited, and that to limit the scope of a remand, we "must

convey clearly [our] intent to limit the scope of the district court's review," *United States v. Orlando,* 363 F.3d 596, 601 (6th Cir. 2004) (quoting *United States v. Campbell,* 168 F.3d 263, 267 (6th Cir. 1999)), with language that is "in effect, unmistakable," *Campbell*, 168 F.3d at 268. It is also true that a remand that contains a multiplicity of issues requiring reconsideration renders a limited remand less "desirable or effective." *Id.* But the standard for a limited remand was met here. The prior panel's remand said, "[W]e . . . VACATE Defendant's sentence, and REMAND to the district court for a recalculation of the drug quantity attributable to Defendant." *Woodside*, 642 F. App'x at 498 (emphasis omitted). That mandate unmistakably limited the scope of the remand to the issue of drug quantity.

Not only does this operative final language speak in limited terms, but the whole thrust of our previous opinion was focused on the need for the district court to explain how it reached the conclusions that it did regarding the drug amounts. On remand, district courts are to "implement both the letter and the spirit of the mandate." *United States v. Haynes*, 468 F.3d 422, 425 (6th Cir. 2006) (quoting *United States v. Moore,* 131 F.3d 595, 599 (6th Cir. 1997)). We carefully explained the basis for the remand in this case:

> Although the district court stated that it used a calculator in arriving at its calculation of 28,000 kilograms of marijuana, it never explained how it turned Breeden's testimony into a final figure. We are mindful that district courts sometimes struggle to calculate drug quantities in complex cases. . . . However, in such cases where evidence is controverted, calculations are complicated, and appeals are likely to follow, it is especially important to create a clear record to facilitate appellate review. The calculation at issue here involved especially many moving parts: the chronology of when Defendant began selling to Stafford and Breeden and when Stafford and Breeden stopped purchasing from McGregor; how many pills Defendant provided while McGregor was also providing pills; the number of pills sold at the end of the conspiracy; the dosage of the pills; the proportion of oxycodone to other drugs; and the equivalent weight in marijuana, among others. While we are sympathetic to the district court's frustration, the absence in the record of the numbers the district court used renders its methodology totally opaque, and compels us to vacate Defendant's sentence and remand for a better explanation of the district court's calculation, or for recalculation of the quantity of drugs for which Defendant is to be held accountable.

*Woodside*, 642 F. App'x at 496. We also explained that it was unclear whether the district court had held Woodside responsible for drugs sold by McGregor. *See id.* at 497. Nothing in this

analysis contemplates the necessity or even advisability of taking any further evidence, or even holding a nonevidentiary hearing. The gist of our mandate was that the district court ought to "show its work." The court did just that when it issued the amended judgment, which included supplemental findings of fact on the drug-quantity issue, based on the evidence presented at Woodside's prior sentencing hearing. Perhaps the district court, in its discretion, could have held a new sentencing hearing consistent with the mandate, but that does not answer the question here, which is whether the district court committed reversible error by not doing so. It did not.

Our precedents support this conclusion. We have held that limiting language need not be in the final sentence of the opinion, but may be found "anywhere in an opinion or order, including a designated paragraph or section, or certain key identifiable language." *Orlando*, 363 F.3d at 601. Limited remands in the sentencing context, moreover, may "explicitly outline the issues to be addressed by the district court and create a narrow framework within which the district court must operate." *Campbell*, 168 F.3d at 265. "[A] limited remand constrains the district court's resentencing authority to the issue or issues remanded." *Garcia-Robles*, 640 F.3d at 166 (quoting *Moore,* 131 F.3d at 597–98).

Second, because no new sentencing *procedure* was required or conducted, as opposed to a new reason or a new explanation of the reason for the sentence, the district court did not violate the procedural guarantee of 18 U.S.C. § 3553(c), particularly given that there was no change in Woodside's sentence. Section 3553(c) provides that the court "at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence." According to Woodside, the district court ran afoul of this requirement when the court explained its drug-quantity calculation and resentenced him through the written amended judgment, rather than in an open court session. But that statute is not implicated here.

Most importantly, the text of § 3553(c) indicates that it does not apply here. Section 3553(c) applies "at the time of sentencing," which, read naturally, refers to a defendant's sentencing hearing. As we said in *Downs v. United States*, 879 F.3d 688 (6th Cir. 2018)*,* albeit in response to a different argument, "the term sentencing in legal as in ordinary language refers to the pronouncing of sentence by the judge in open court." *Id.* at 690. As noted above, the remand from Woodside's prior appeal did not entitle him to a new sentencing hearing nor did the

district court choose to hold one.  Section 3553(c), then, by its own terms, applies on remand if and only if that remand requires or entails a new sentencing hearing, and since the remand here did not, reversal is not warranted.

Under the facts of this case, moreover, Woodside's presence at his prior sentencing hearing satisfies § 3553(c).  We have held that the procedural right to allocute under Federal Rule of Criminal Procedure 32(i)(4)(A)(ii) does not apply to cases on limited remand.  *See United States v. Jeross*, 521 F.3d 562, 585 (6th Cir. 2008).  We later explained in *Garcia-Robles* that "[u]pon limited remand, the district court in *Jeross* was not required to 'begin anew,' and thus could rely upon the procedural rights provided to the defendants prior to remand."  640 F.3d at 166.  So too here.  As explained above, the limited remand from Woodside's first appeal required the district court only to "show its work" with respect to its drug-quantity calculation, which it did in the amended judgment.  Here, as in *Jeross*, the remand did not require the district court to start over.  Indeed, like the sentencing court in *Jeross*, the district court here relied on the same record and imposed the same sentence as in the first go-around.  *See* 521 F.3d at 585–86.  It was therefore permissible for the district court to rely on Woodside's presence at his initial sentencing hearing to satisfy the procedural requirement of § 3553(c).

Practical considerations also support this rule.  Woodside was not entitled to a new sentencing hearing, *see Garcia-Robles*, 640 F.3d at 166, and it is equally clear that he was not entitled to another allocution, *see Jeross*, 521 F.3d at 585.  Woodside's argument thus asks for an open court session, at which he is not entitled to put on evidence, to make argument, or to address the court.  Because neither the statute nor our precedents dictate that result, such pageantry is not required.

True, Woodside's brief on appeal at one point appears to suggest that the district court's purported violation of § 3553(c) requires a new sentencing hearing at which he could "present argument."  But as noted above, our prior remand did not entitle Woodside to a new hearing.

Third, Woodside argues that his sentence was procedurally unreasonable because the district court erroneously attributed to him drugs that were sold by McGregor and thus were not

part of any criminal activity to which Woodside had agreed.[2]  But affirmance is still warranted regardless of whether the district court erroneously attributed to Woodside drugs sold by McGregor, because Woodside would still have been sentenced according to the same base-offense level under any conceivable estimate of the drugs that he himself sold during the period at issue. Any error on this point was therefore harmless.

A few brief calculations are necessary to show why this is so.  Woodside's base-offense level was 34, assigned to those responsible for 10,000 to 30,000 kilograms of marijuana equivalent.  According to the guidelines, each gram of actual oxycodone is equivalent to 6.7 kilograms of marijuana, *see* USSG § 2D1.1 comment. (n.8), and therefore each pill of oxycodone (which contains 27 milligrams of actual oxycodone) is equivalent to .1809 kilograms of marijuana.  Here the district court on remand held Woodside responsible for 157,920 oxycodone pills, equal to a nearly range-topping 28,568 kilograms of marijuana. To reduce Woodside's base-offense level down to 32—the next lowest level, assigned to those responsible for less than 10,000 but more than 3,000 kilograms of marijuana equivalent—the district court would have needed to attribute fewer than 55,279 oxycodone pills to him.

Woodside was responsible for more pills than that under any remotely plausible estimate. In its amended judgment, the district court considered the drugs attributable to Woodside from three different periods of time: January 2010 through June 2011; July 2011 through September 2012; and October 2012 through May 2013.  McGregor had nothing to do with the latter two periods, which occurred after Stafford and Breeden had stopped buying from him.  During those two periods alone, the district court found Woodside responsible for selling approximately 48,720 pills,[3] and Woodside does not appear to challenge those calculations (apart from his

---

[2]Woodside's brief purports to attack his sentence on substantive grounds as well, but the only arguments he presses are procedural in nature.  In *Gall v. United State*s, 552 U.S. 38, 51 (2007), the Supreme Court listed as examples of procedural errors: "[a district court's] failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." Woodside's two sentencing arguments—that the district court erroneously attributed to him drugs sold by McGregor and failed to "err on the side of caution" when choosing which drug-quantity testimony to credit—are similarly procedural.

[3]The district court explained that it held Woodside responsible for "approximately 42,000 oxycodone pills . . . for the time period from July 2011 through September, 2012[,]" and "approximately 6,720 oxycodone pills (210 pills per week for 32 weeks) . . . for the eight-month period prior to his arrest in June, 2013 (October 2012 through May, 2013)."

wholesale challenge to the district court's reliance on Stafford's testimony, discussed in footnote four below). During the earliest period—from January 2010 through June 2011, when both McGregor and Woodside were selling to Stafford and Breeden—the district court found "approximately 109,200 oxycodone pills" attributable to Woodside, holding Woodside responsible for all the oxycodone pills McGregor sold during that time. But even if the court were to have held Woodside responsible for only *seven percent* of the drugs distributed during that time—a mere 98 pills per week, for a total of 7,644 pills during the 18-month period— Woodside would still be responsible for 56,364 pills during that period, comfortably qualifying him for the same base-offense level of 34. Woodside nowhere argues that he sold so few pills during that eighteen-month period. In any event, the record would foreclose such a finding: Stafford testified that he received 1,000 pills *per week* from Woodside during the period at issue, and Agent Lewis testified that Woodside admitted to sending "hundreds [of pills] at a time," and that based on his "experience with the investigation," this occurred "at least once a week." For that reason, any error that the district court might have committed by attributing to Woodside drugs sold by McGregor was harmless.

Fourth and finally, Woodside argues that the district court committed procedural error by failing to "err on the side of caution" when choosing between Stafford's and Breeden's testimony regarding drug quantity. But this argument also fails because the choice between the testimony of the two apparently did not matter.[4] Our review is for clear error. *See Jeross*, 521 F.3d at 570 (citing *United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004)). At Woodside's sentencing hearing, the district court relied at least in part on Breeden's testimony to hold Woodside responsible for 28,000 kilograms of marijuana equivalent: "Ms. Breeden does come under a little bit when she gets to 28[-thousand grams of marijuana equivalent]. . . . I'm going to give him the benefit of the doubt, and I'll go with Ms. Breeden." On remand, the district court held Woodside responsible for 28,568 kilograms by relying on Stafford's testimony. That small difference in drug quantity did not affect Woodside's sentence, and Woodside does not explain how relying on Breeden's testimony would result in a lower

---

[4]To the extent that Woodside means to challenge the district court's reliance on Stafford's and Breeden's testimony because those two were abusing drugs at the time of the relevant events, we have already rejected that argument in Woodside's previous appeal. *See Woodside*, 642 F. App'x at 495.

sentence.    Indeed, the panel noted in Woodside's prior appeal that "Stafford and Breeden corroborated each other's testimony in many respects, which was in turn corroborated by the [DEA] agents."  *Woodside*, 642 F. App'x at 495.  The district court need only have found that Woodside was "more likely actually responsible for a quantity greater than or equal to the amount used in calculating the sentence."  *Jeross*, 521 F.3d at 571.  There is ample testimonial evidence that Woodside was responsible for more drugs than were used to calculate his sentence, and therefore the district court did err on the side of caution.[5]  So regardless of whether the district court arrived at its approximation by relying on the testimony of Stafford or Breeden, or some synthesis of the two, the record supports that approximation, and it therefore was not clearly erroneous.

Woodside's sentence is therefore affirmed.

---

[5]For example, in the amended judgment, the district court noted that "[a]lthough there is evidence to support an earlier date . . . *in order to err on the side of caution*, the Court will not attribute to the Defendant any pills sold by either Mr. McGregor or himself prior to January, 2010."  (Emphasis added.)  The district court also "erred on the side of caution" by consistently relying "on the low end of Mr. Stafford's estimates."

———————————

**CONCURRENCE**

———————————

JANE B. STRANCH, Circuit Judge, concurring.  I concur with the majority opinion. I write separately to emphasize the principle that underlies the issues we address here—the importance of the pronouncement of sentence in open court in the presence of the defendant. "[T]he notion that the sentencing court must 'eyeball' the defendant at the instant it exercises its most important judicial responsibility . . . is far from a formality." *United States v. Garcia-Robles*, 640 F.3d 159, 164 (6th Cir. 2011) (alteration in original) (quoting *United States v. Faulks*, 201 F.3d 208, 209 (3d Cir. 2000)).  "Indeed, this requirement 'is a fundamental procedural guarantee that places the defendant before the judge at a culminating moment of the criminal judicial process.'" *Id.* (quoting *Faulks*, 201 F.3d at 211).

Resentencing exists within the arena of judicial discretion.  Resentencing "is not a unitary phenomenon." *United States v. Bryant*, 643 F.3d 28, 33 (1st Cir. 2011).  "At one extreme, the resentencing ordered may be as unconstrained and open-ended as an initial sentencing; but at the other extreme, a remand may be so focused and limited that it involves merely a technical revision of the sentence dictated by the appeals court and calls for no formal proceeding." *Id.* at 32.  As cases move across this continuum from de novo sentencing under a general remand to technical sentence revision, there may be circumstances that require the presence of the defendant, mandate a sentencing hearing, or call for the pronouncement of sentence in open court, even on a limited remand.  "The sheer number of issues causing remand can affect" the scope and nature of a remand. *United States v. Campbell*, 168 F.3d 263, 268 (6th Cir. 1999).  It is incumbent upon the appellate court "to outline the future intended chain of events.  It is the job of the appellate court adequately to articulate instructions to the district court in the remand." *Id.*

Thus, an appellate court has the discretion to mandate that a district court hold a hearing in the defendant's presence on a limited remand. *See, e.g.*, *United States v. Moore*, 76 F.3d 111, 114 (6th Cir. 1996) (*Moore II*) (providing on remand the opportunity for new evidence and argument "to focus on the facts and law relevant to proving" a § 924(c)(1) violation); *United*

*States v. Moore*, 131 F.3d 595, 599–600 (6th Cir. 1997) (finding the remand in *Moore II* to be a limited remand).  A district court also may exercise its discretion to hold a hearing or to add other procedural protections not mandated by the appellate court but within the scope of its remand.  Indeed, the precedent on which we rely today did not mandate the right to allocution, but it counseled that "the better practice is for a district court to permit allocution at any sentencing proceeding, regardless of the timing, and the district court below would have been well advised to do so in this case." *United States v. Jeross*, 521 F.3d 562, 586 (6th Cir. 2008).

Although our holding recognizes that a defendant is not automatically entitled to the full panoply of procedural rights on a limited remand, our obligation in crafting such a remand requires us to consider the specific nature of the inquiry before the district court and to provide corresponding procedural safeguards in our remand instructions.  A district court may then find it necessary to extend other procedural rights, and may do so as long as its actions are consistent with the "letter and the spirit of the mandate." *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994) (quoting *United States v. Kikumura*, 947 F.2d 72, 76 (3d Cir.1991)).